## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Barred Business, John Cole Vodicka, and Steven Williams, <br><br> *Plaintiffs*, <br><br> v. <br><br> Brian Kemp, Governor of Georgia; Christopher M. Carr, Attorney General of Georgia; Keith E. Gammage, Solicitor General for Fulton County; and Will Fleenor Solicitor General for Athens-Clarke County, <br><br> *Defendants*. | Case No.: _____ <br><br><br> **Complaint for Declaratory and Injunctive Relief** |

## INTRODUCTION

1.      This is a constitutional challenge to Section 4 of Georgia Senate Bill 63 ("Section 4"), which goes into effect on July 1, 2024. Section 4 severely restricts individuals, groups, and entities from engaging in charitable bail work—paying bail for those detained solely because they are impoverished— within the state of Georgia.

2.      Section 4 of Senate Bill 63 imposes what are arguably the most severe restrictions on charitable bail funds in the nation. If allowed to go into

effect, these restrictions will effectively eliminate charitable bail funds in Georgia.

3.      Section 4 makes it a crime for Plaintiffs and others to post "more than three cash bonds [] per year . . . in any jurisdiction."  Meanwhile, for-profit surety companies can apparently post an unlimited number of surety bonds.

4.      Section 4 also requires, subject again to criminal penalties, "[e]very individual, corporation, charity, nonprofit organization, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons" to submit to onerous requirements that have, until now, been applied only to for-profit surety bail companies. The application of these requirements to Plaintiffs and others similarly situated is incredibly burdensome—perhaps insurmountable—and is both irrational and arbitrary.

5.       Even if an entity was able to register as a surety bonding company, the law's plain language would still prohibit them from posting more than three cash bonds per year in any jurisdiction.

6.      Section 4 violates the First Amendment rights of Plaintiffs and others similarly situated. Their charitable bail work is constitutionally protected expressive conduct, expressing Plaintiffs' opposition to poverty-based detention and in support of the freedom for those they believe to be

unjustly incarcerated. The charitable bail work also constitutes group behavior, as Plaintiffs and others similarly situated connect with each other, people detained, donors, and the broader community in collective action in opposition to poverty-based detention. Section 4 unconstitutionally burdens these fundamental rights to free speech and free association.

7.     Section 4 also violates the religious liberty of Plaintiffs Vodicka and Williams and others similarly situated. Their charitable bail work is an exercise rooted in their religious faith, and Section 4's restrictions unconstitutionally restrict that exercise under the First Amendment's Free Exercise Clause.

8.     Section 4 further violates the Due Process Clause, which requires that a law give fair notice of the conduct it punishes. Here, though, the statutory language is vague and incoherent, leaving Plaintiffs and others similarly situated in the dark about what activities are prohibited under the law.

9.     Section 4 also violates the Equal Protection rights of Plaintiffs and others similarly situated because it irrationally preferences the activities of for-profit surety bonding companies over those of people engaged in charitable bail work. Finally, it violates the Eighth Amendment's Excessive Bail Clause, which prohibits imposing a condition on pretrial arrestees unrelated to the ostensible purpose for which bail is required.

10.    Defendants cannot demonstrate any government interest—whether rational, substantial, or compelling—for Section 4's restrictions, which pose an existential threat to the bail work undertaken by Plaintiffs and others similarly situated.

11.    Plaintiffs seek declaratory and injunctive relief to enjoin Section 4's enforcement. Without such relief, Plaintiffs will suffer immediate and irreparable injury.

## PARTIES

### A. Plaintiff Barred Business

12.    Plaintiff Barred Business Foundation Co. ("Barred Business") is a community-based nonprofit organization in Atlanta, Georgia. It is led by and for people with prior involvement with the criminal legal system and seeks to heal, activate, resource, and empower others who have been similarly justice-impacted.

13.    Barred Business believes in investing in communities and building opportunity for justice-impacted people, and it opposes mass incarceration and the money bail system, which have disparate impacts on people of color and other marginalized groups.

14.    In furtherance of its mission to build systems of care and to dismantle systems of unjust punishment, Barred Business provides a series of programs aimed at supporting justice-impacted people. One of these

programs is its bailout campaign for those who are detained pretrial on bail that they cannot afford.

15.     For example, in partnership with the Free Atlanta Abolition Movement (FAAM) and other organizations, Plaintiff Barred Business participates in an annual "Black Mamas Bail Out" that aims to "free as many Black mamas and caregivers as [they] can so they can spend Mother's Day with their families and in their communities." The campaign seeks "to bring attention to the more than half-million people in jail who have not been convicted of any crime, but don't have the money to post bail." Barred Business also hosts a brunch for the freed mothers and their families to celebrate their freedom and the importance of their role as mothers.

16.     The Barred Business model is built on relationships. Barred Business identifies potential recipients of bail through community engagement and spends time undertaking a careful intake assessment.  In determining who to bail out, the organization prioritizes low-income mothers who have been "left behind"—that is, detained for an extended period on high bail amounts unlikely to be paid without community intervention—and who the organization has sufficient resources to support upon reentry into the community and preparation for trial.

17.     For Barred Business, bailing someone out means both welcoming that person to the Barred Business family, and expressing a powerful

message against unnecessary incarceration. When someone is bailed out, an employee or volunteer with Barred Business will wait (all day if needed) in order to celebrate the person's release and welcome them back into the community with open arms and a bouquet of flowers.

18.    Barred Business will only bail someone out if it has the resources to support that person to help them succeed in their reentry. For example, Barred Business runs a year-long program which provides training, political education, leadership development, housing, and wraparound programming and support for formerly incarcerated Black women who are returning to their communities.

19.    Barred Business provides not only social services and financial support, but moral and emotional support as well. When a person who has been bailed out appears in court, Barred Business representatives also attend, eager to talk to the judges and demonstrate the community's support for the person who has been bailed out.

20.    Barred Business's participation in the Black Mamas Bail Out and other bailouts is a form of direct action in expression of its opposition to the money bail system and its support for self-determination and opportunity for justice-impacted individuals. It is similarly an expression of Barred Business's belief that when justice-involved people are allowed freedom and given support, they and their communities can thrive.

21.    Barred Business is a nonprofit organization that is exempt from federal taxes as a charitable organization under section 501(c)(3) of the Internal Revenue Code. It receives financial support both from other coalition members and from contributions from individual members of the community who wish to support Barred Business's activities, including its bailout campaigns.

22.    To support its work, including its payment of cash bail, Barred Business solicits donations from the public. One way that Barred Business solicits donations is through a publicly available website where it encourages members of the public to "Give Justice Impacted People the Gift of Freedom!"

**B. Plaintiff John Vodicka**

23.    Plaintiff John Vodicka is a member of Oconee Street United Methodist Church ("Church") in Athens, Georgia, and he coordinates the charitable bail fund that is administered by the Church's Justice & Outreach Committee.

24.    The charitable bail fund started in 2021 after members of the congregation who were engaged in the Church's court-watching program noticed that people were being held in pretrial detention for extended periods of time on very small bail amounts because they could not afford to pay.

25.     The bail fund only bails out people who are being detained on small dollar amounts in the Athens-Clarke County Jail; the majority of people the bail fund has bailed out have had bail amounts of less than $100.

26.     The bail fund receives referrals primarily from public defenders and, occasionally, from judges, law enforcement, or defendants' families. Most of the people who the bail fund bails out have been in detention for a week or longer. Some have been detained for months. In 2023, the bail fund paid cash bail for approximately 50 people. As of June 2024, the bail fund has paid cash bail for several dozen individuals this calendar year.

27.     Vodicka's charitable cash bail work is widely known to public defenders, judges, court staff, and jail employees. Jail staff know that he is there because of his service with the Church and the charitable bail fund. Vodicka always notes his affiliation with the Church when he visits the jail to post charitable bail.

28.     Others involved in the criminal legal system, such as public defenders, judges, and prosecutors know Vodicka and that his charitable bail work is driven both by his faith and his opposition to poverty-based detention.

29.     Volunteers for the bail fund, including Vodicka, believe it is important to "walk with" each person who is bailed out. They meet the person

outside of the county jail, provide contact information, and offer support like money for food or a ride to where the person needs to go.

30.     Vodicka and other volunteers continue to "walk with" the people the fund bails out throughout their involvement with the criminal legal system. Vodicka and other volunteers remind the defendant of future court dates and provide a ride to court if the defendant needs it. Vodicka and other volunteers also will show up in court to support the defendant.

31.     Vodicka has spent hundreds of hours volunteering in connection with the bail fund and has bailed out more than 90 people over the past few years.

32.     Vodicka has already made more than three cash bail payments this year. Indeed, on the day after SB 63 was signed into law, Vodicka paid three separate cash bail payments, totaling $320.

33.     Paying cash bail to release impoverished individuals is done as part of Vodicka's practice of his religious faith. For example, Vodicka cites the Bible, Matthew Chapter 25, where Jesus celebrates disciples who visit people in prison. *See* Matthew 25:36 ("I was in prison, and ye came unto me."). And Vodicka celebrates Jesus's example of overturning money-changing tables in the Temple, which Vodicka views as reminiscent of the monetization of freedom driven by the cash bail system and the surety bonding industry.

Vodicka believes that Jesus urges his followers to love their neighbors, which includes a call to love the poor, the outcast, and the prisoner.

34.    In fact, much of Vodicka's adult life has been spent practicing his religious faith through supporting justice-impacted individuals. For several years he served as a lay chaplain for the Diocese of Alameda County, California, where he ministered to people held in jail. He and his wife were later active members of the Open Door Community, "a residential Christian community . . . . [b]elieving that the Gospel of Jesus Christ is a radical Word that calls for justice and righteousness rooted in the non-violent love of the Cross," where he supported prisoners on death row in Jackson, Georgia, as part of his service. They later lived and worked on Koinonia Farm, a Christian community in Americus, Georgia, that "strive[s] to demonstrate the way of Jesus as an alternative to materialism, militarism and racism." Vodicka has also served in other leadership roles in other Christian-based and social justice organizations throughout his life, including advocating for and sheltering the homeless poor, and engaging clergy and laypeople with issues in the criminal legal system.

35.    Vodicka has written extensively about his work with the charitable bail fund and the lessons he has drawn from his experience with bailing people out. For example, in a 2023 essay published in Flagpole Magazine, Vodicka narrated the stories of several people he had bailed out,

explaining that this experience "made [him] aware of how the sinister cash bail system essentially denies poor persons their fundamental right to the presumption of innocence by denying them their pretrial liberty." John Vodicka, *Cash Bail Keeps People Locked Up Just Because They're Poor,* Flagpole (Oct. 11, 2023), https://perma.cc/3HQB-LMWZ. He explained, for example, that "[o]ne of these prisoners had been unable to post a $85 bond; another, $50. Nine could not post bonds in the amount of $10, and one needed $5 to gain release from jail. Five people had no one to post $1. All were charged with misdemeanor offenses. Collectively, these 17 women and men spent 274 days in the Clarke County jail before our bail fund set them free."

36.    Vodicka also shares his experience bailing people out in his personal newsletter, called *Bearing Witness*, which is sent to several hundred subscribers. He also contributes similar essays to another newsletter, *Hospitality*, that goes out to Christian faith communities around the country. In response to his writings, readers have sent in money donations to be used for charitable bail.

**C. Steven Williams**

37.    Plaintiff Steven Williams volunteers alongside Plaintiff Vodicka with the bail fund affiliated with the Oconee Street Church.

38.    Williams has been a member of the United Methodist Church since the 1970s, including a member of the Oconee Street United Methodist

Church for approximately 20 years. He has held many leadership positions within the church, including serving for several years as Chair of the Oconee Street United Methodist Church Council, the Church's governing body.

39.     When Williams moved to the area, his family chose the Church because of its ministry that emphasized service and showing love to all members of the community, including people in poverty or experiencing homelessness. The Church's charitable bail fund is a continuation of that longstanding ministry.

40.     Williams views his work with the charitable bail fund and his act of bailing people out as central to his religious faith. For example, Williams is guided by Jesus's teaching that the second most important commandment, after loving God, is to "love your neighbor as yourself." Bible, Matthew 22:39. This has always been at the heart of Williams's religious beliefs, and his religious practice, including his work paying charitable bail.

41.     Like Vodicka, Williams regularly bails out people held in detention in Athens-Clarke County jail on low-dollar bail amounts. Williams usually bails people out using funds from the charitable bail fund, although he also sometimes will use his own money.

42.     Williams has already bailed out more than three people in 2024, and normally would continue to bail people out throughout the year.

**D. Defendants**

43.      Defendant Brian Kemp is the Governor of the State of Georgia. Governor Kemp is responsible for law enforcement in the State of Georgia, and is charged with executing the laws faithfully, including the three-cash-bail limit and restrictions on solicitation of charitable donations in Senate Bill 63.  The Governor further has residual power to commence criminal prosecutions and has the final authority to direct the Attorney General to initiate and prosecute on behalf of the State.

44.      Defendant Christopher Carr is the Attorney General of the State of Georgia. Attorney General Carr bears responsibility for the enforcement of Georgia law, including the authority to prosecute individuals for exceeding the three-cash-bail limit and  restrictions on solicitation of charitable donations in Senate Bill 63.

45.      Defendant Keith Gammage is the Solicitor General of Fulton County. Solicitor Gammage has the authority to prosecute misdemeanors in Fulton County, including the concurrent authority to prosecute individuals for violations of Section 4 of Senate Bill 63.

46.      Defendant Will Fleenor is the Solicitor General for Athens-Clarke County and has authority to prosecute misdemeanors in Athens-Clarke County Court. Solicitor Fleenor has concurrent authority to prosecute individuals for violations of Section 4 of Senate Bill 63.

47.    Because the equitable relief sought by Plaintiffs would run against their offices, Defendants are named in their official capacities.

## JURISDICTION AND VENUE

48.    Plaintiffs' claims are brought under 42 U.S.C. § 1983 and the First, Eighth, and Fourteenth Amendments to the United States Constitution.

49.    This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

50.    Venue is proper in the United States District Court for the Northern District of Georgia under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit have occurred or will occur in this judicial district. This District is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district.

## FACTS

### A.    Bail and Pretrial Detention in Georgia

51.    Unless and until convicted through due process of law, a person arrested or charged with a crime is presumed innocent. This presumption of innocence is a "bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal

law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)).

52.    Thus, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The detention exception is reserved for situations where the government demonstrates to a judge a "sufficiently weighty" interest to overcome "the individual's strong interest in liberty," as when the government presents sufficient evidence to show that the person is a flight risk or a danger to the community. *Id.* at 749.

53.    Georgia law has several statutes that regulate the standards and procedure for pretrial detention. Often a judge can release an arrestee on unsecured judicial release, without requiring the payment of money bail. Ga. Code Ann. § 17-6-12(a)(2).

54.    For misdemeanor offenses, if a judge requires money bail, it "shall not [be] excessive," and the court "shall impose only the conditions reasonably necessary to ensure such person attends court appearances and to protect the safety of any person or the public." Ga. Code Ann. § 17-6-1(b)(1), (e).

55.    For many types of offenses, a judge "may by written order establish a schedule of bails" that entitles an arrestee "to be released from

custody upon posting bail as fixed in the schedule." Ga. Code Ann. § 17-6-1(f)(1).

56.     When bail is set, a person is not released from detention until they are able to tender bail in the amount established by the court.

57.     Georgia law recognizes two relevant methods for tendering the amount of bail required: "cash bail" or a "surety bond." (Detainees also can post a property bond: the submission of collateral based on real property located in the relevant county. Ga. Code Ann. § 17-6-15(b)(3).)

58.     Cash bail involves release of the arrestee upon "depositing cash in the amount of the bond so required with the appropriate person, official, or other depository." Ga. Code Ann. § 17-6-4(a). Once deposited, the government immediately gains access to cash in the entire amount of the bond.

59.     The government holds the cash until the arrestee appears in court and satisfies the conditions for return of the cash deposit, or, if the arrestee fails to appear, the court orders the entire sum to be forfeited.

60.     Because the entire cash bail amount is in the custody of the government and held until the conditions are satisfied, the State of Georgia currently poses no limitation on who makes the payment or how many payments may be made by any given person.

61.     A surety bond, in contrast, relies on a for-profit surety bonding company to submit a bond on the arrestee's behalf. The arrestee pays the

surety company a fee of up to 15% of the amount of bail. Ga. Code Ann. § 17-6-30(a).

62.    Because the fee amount is tied to the amount of bail, for-profit surety companies prefer larger bond amounts over smaller ones, and typically do not provide surety bonds for small dollar amounts.

63.    With surety bonds, instead of providing the full bail amount to the court, the surety bonding company files a surety bond that assures the court the company will pay the full bail amount *if* the bail is forfeited.

64.    Because the court is relying on the promise to pay if the bond is forfeited, each professional surety bonding company must be approved by the county sheriff of each jurisdiction in which it seeks to operate.

65.    The company must be licensed and comply with a number of requirements to show each sheriff that it is an "acceptable surety," including written rules and regulations published by each sheriff. Ga. Code Ann. § 17-6-15(b)(1).

66.    Additional requirements imposed by statute include maintaining a substantial cash escrow and providing extensive documentation to the county sheriff, among other requirements. *See* Ga. Code Ann. § 17-6-15.

67.    If an arrested person freed on a surety bond misses a court date, as with cash bail, the surety bond may be subject to forfeiture. But for-profit bondspersons receive additional protections before they may be obligated to

produce the entire bond amount, including strict notice requirements. *See* Ga.
Code Ann. § 17-6-71. Moreover, there are many circumstances where a
bonding company will be excused from further liability. Ga. Code Ann. §§ 17-
6-31, 17-6-72.

68.     As a practical matter, for-profit surety bonding companies rarely
are required to pay the full amount of forfeited bonds. *See, e.g.*, Wendy
Sawyer, *All Profit, No Risk: How the Bail Industry Exploits the Legal System,*
Prison Policy Initiative (Oct. 2022), https://perma.cc/3D9V-CJE7; Allie
Preston & Rachel Eisenberg, *Profit Over People: The Commercial Bail
Industry Fueling America's Cash Bail Systems*, Ctr. for Am. Progress (Jul. 6,
2022), https://perma.cc/K6RA-KYJH.

69.     Indeed, some courts have a practice of not pursuing forfeiture of
the entire bond from for-profit surety companies at all. *See, e.g.*, Douglas
County, Georgia, Performance Audit for the Year Ended December 31, 2016,
at 10, https://perma.cc/YJ8D-9A6B ("[W]hen a bonded party fails to appear in
court, it is the County's practice to require the bonding company to forfeit to
the County 5% of the total bond (which was collected at the time of the initial
release of the accused) and not the total amount of the established bond.").

70.     In contrast, when cash bail is forfeited, 100% of the amount is
immediately lost. Because the cash is already in the government's custody

and control, the court does not need to take additional steps to obtain the

forfeited funds from another source.

71.    Tying a person's detention or release to the amount of money

they have has been widely criticized.

72.    A robust and ever-increasing body of empirical literature

confirms that conditioning release upon the payment of bail does not further

appearance rates or any public safety goals. *E.g.*, United States Commission

on Civil Rights, *The Civil Rights Implications of Cash Bail* (Jan. 2022),

https://perma.cc/XC34-7HJN; Michael R. Jones, *Unsecured Bonds: The As*

*Effective and Most Efficient Pretrial Release Option*, Pretrial Justice Institute

(Oct. 2013); Aurélie Ouss & Megan Stevenson, *Does Cash Bail Deter*

*Misconduct?*, 15 AEJ: Applied Economics 150 (2023).

73.    As the National Institute of Corrections, a federal agency

dedicated to supporting corrections across the country, summarized:

"virtually every neutral and objective bail study conducted over the last 90

years has called for its reform," principally by eliminating access to money as

the primary determinant of whether a person is released or detained.

Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial*

*Practitioners and a Framework for American Pretrial Reform* 17 (National

Institute of Corrections Sept. 2014), *available at* https://perma.cc/D7TD-

CFVT.

74.     Moreover, the harm of holding someone in pretrial detention is significant.

75.     Pretrial detention is strongly and consistently associated with significantly more convictions and higher jail time, compared to similarly situated arrestees who are released. *E.g.*, Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J. L. Econ. & Org. 511 (2018).

76.     Available empirical evidence also suggests pretrial detention *worsens* public safety outcomes. Will Dobbie, Jacob Goldin & Crystal S. Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 Am. Econ. Rev. 201, 227 (2018) (finding pretrial detention increases future recidivism rates).

**B.     Charitable Bail Funds**

77.     "For as long as there have been jail cells and bondage in America, families and communities have pooled their resources together to try to purchase the freedom of their loved ones." Robin Steinberg, Lillian Kalish & Ezra Ritchin, *Freedom Should Be Free: A Brief History of Bail Funds in the United States*, 2 UCLA Crim. Just. L. Rev. 79, 80 (2018).

78.    More than 100 years ago, the American Civil Liberties Union created a bail fund to free individuals prosecuted under sedition laws. *Plans a Radical Bail Fund.: Civil Lborties [sic] Union Proposes to Raise $300,000*, N.Y. Times, Aug. 16, 1920, at 4.

79.    Over the past century, many other communities and groups have collectively raised funds for bail, often as a means to convey support for the activities of the arrested persons, including, for example, civil rights protesters. Steinberg et al., *supra*, at 84-88.

80.    Today, there are a wide variety of charitable bail funds with different approaches and priority issues, but who share a common characteristic: "A community bail fund's interest in a defendant's case stems not from personal connections to that defendant, but rather from broader beliefs regarding the overuse of pretrial detention among particular neighborhoods, racial or socioeconomic groups, or political organizations." Jocelyn Simonson, *Bail Nullification*, 115 Mich. L. Rev. 585, 600 (2017).

81.    Charitable bail funds typically express opposition to wealth-based pretrial detention like that used in Georgia.

82.    These charitable bail funds educate members of the community about the harms of wealth-based detention, encourage people to donate money and time to oppose wealth-based detention, and make a powerful statement against wealth-based detention by liberating a person who has

been cleared for release by a court but detained solely for lacking access to money to pay bail.

83.    Bail funds often pay bail to express opposition to the overincarceration and unnecessary detention of members of particular communities, such as Black people, mothers, or members of the LGBTQ+ community.

84.    Like the ACLU's bail fund from the 1920s, some bail funds today pay bail to convey support for protesters' and others' ability to freely exercise their First Amendment rights, and not linger in jail because of that exercise.

85.    Indeed, the legislative history of Senate Bill 63 suggests that the legislators were seeking to punish charitable bail funds based on their opposition to one specific bail fund that works to communicate support for people's freedom of speech. .

86.    Some bail funds were started by public defenders, who saw first-hand how their clients were trapped under the weight of bail amounts they could not pay, and who recognized that bailing out their clients helped them better navigate the criminal legal system. *E.g.*, Nick Pinto, *The Bail Trap*, N.Y. Times (Aug. 13, 2015), https://www.nytimes.com/2015/08/16/magazine/the-bail-trap.html; Jamila Pringle, *Bail Fund Aims to Free Poor Defendants*, City Limits (Aug. 13, 2012), https://citylimits.org/2012/08/13/bail-fund-aims-to-free-poor-defendants/.

87.    Indeed, holding someone in pretrial detention because they lack access to money hinders their ability to "prepar[e] [their] defense. [They] cannot locate witnesses [and] cannot consult [their] lawyer in private." S. Rep. No. 89-750, at 7 (1965).

88.    Such detention makes it more difficult for the arrestee to assert their right to a trial and make informed decisions about plea deals free from the pressure that comes from lingering in jail.

89.    Some bail funds engage in messaging campaigns in conjunction with their bail payments to underscore their purpose and what they express, as illustrated by the Black Mamas Bail Out campaign. *See supra* at ¶ 15. As demonstrated by Plaintiffs Vodicka and Williams, bail funds and the people who carry out their work also often express and exercise the beliefs of religious faiths. "[C]hurches have long had a practice of passing a hat to collect funds to help people with bail and legal defense." Simonson, *supra*, at 600.

90.    Across the nation, countless churches solicit donations from their parishioners and supporters in order to bail out members of the community who face pretrial detention. *See, e.g.*, Presbyterian Church of the United States, *Give to End Cash Bail*, https://www.presbyterianmission.org/donate/e052193-end-cash-bail/.

91.    Charitable bail funds also provide a powerful organizing tool, providing a platform and a vehicle by which members of a community can connect with like-minded individuals over shared concerns about injustice, and work collectively to improve their community in a specific way. *E.g.*, *National Bail Fund Network, Community Bail Funds as an Organizing Tool*, https://bigdoorbrigade.com/wp-content/uploads/2019/08/CJE_NBFN_ Funds-as-an-Organizing-Tool.pdf.

92.    Charitable bail funds, both in Georgia and across the country, have been successful in achieving their goals—obtaining pretrial liberty for many individuals while expressing their opposition to cash bail and overincarceration—without harming public safety.

93.    Charitable bail funds regularly report perfect or near-perfect appearance rates, higher than those provided by surety bond companies. *E.g.*, California Pretrial Release Considerations: A Bench Book for California Superior Court Judges 17, https://docs.google.com/document/d/ 1XjIdSne2B4X4CZ__89mY8sn3XGkufz5RCX3wB6dsO-M/edit ("Bail funds have shown that people return to court, even when a bail fund pays for their release and the individual has no financial ties to their bail payment. Charitable bail funds in California and around the country have demonstrated promising results, showing that people return to court when barriers to return are removed.").

94.     Indeed, although a surety bonding company simply collects its fee and moves on, charitable bail funds have every incentive to ensure that their clients are successful.

95.     Thus, for example, Barred Business provides extensive support to their clients to ensure that they succeed. Unsurprisingly, every Barred Business client has shown up to court.

**C.     Section 4 of Georgia's Senate Bill 63 Criminalizes Charitable Bail Funds**

96.     On May 1, 2024, Governor Kemp signed Senate Bill 63 into law.

97.     Section 4 of Senate Bill 63 imposes what are arguably the most severe restrictions on charitable bail funds in the nation.

98.     If allowed to go into effect, these restrictions will effectively eliminate charitable bail funds in Georgia.

99.     Section 4 amends Georgia Code § 17-6-15 to provide:

No more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit corporation, or group in any jurisdiction. Every individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons shall be required to submit to the same requirements as any professional surety company, including, without limitation, the requirements set forth in paragraph (1) of this subsection and Code Sections 17-6-50, 17-6-50.1, and 17-6-51.

Section 4 imposes criminal penalties for any violation of these provisions and confers "[p]rosecuting attorneys and the Attorney General [with] concurrent authority to prosecute any violation."

100.   Section 4 imposes two restrictions on charitable bail funds that pose an existential threat to their existence.

101.   First, the *three-cash-bail limit* makes it a crime for any individual, charity, or "group" to post "more than three cash bonds . . . per year . . . in any jurisdiction."

102.   The legislation does not define "jurisdiction." Moreover, by limiting the number of cash bail postings that can be made in "any" jurisdiction rather than in "each" or "per" jurisdiction, the law arguably criminalizes the payment of three cash bail payments anywhere in the state, or perhaps beyond, in a single year.

103.   The legislation also does not define "group." Thus, for example, if several members of a church or community share a collective ideology and decide to have each individual post three cash bond payments, they arguably have committed a crime because the total number of cash bond payments for the "group" is more than three.

104.   Because the statute specifies "cash bonds," surety bonds, of the type that professional bonding companies provide, are seemingly not subject to the three-bond limit.

105.   Thus, the State allows for-profit bonding companies to post an unlimited number of surety bonds backed only by a promise to pay but restricts the number of bail payments to three where the amount of bail is tendered in cash, in full.

106.   There is no legitimate government interest that is furthered by preferring a promise to pay to the tendering of payment in full.

107.   The second sentence of Section 4 imposes a *surety licensing requirement* on "[e]very individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons." Any such organization must "submit to the same requirements as any professional surety company," including the requirements in Ga. Code Ann. §§ 17-6-15(b)(1) and 17-6-50.

108.   Under Georgia law, companies that provide surety bonds must be licensed in every county in which they operate and must meet a number of demanding criteria to receive a county sheriff's approval that they are an "acceptable" surety that is capable and willing to pay the full value of the surety bond if demanded by the court. Ga. Code Ann. § 17-6-50(b).

109.   Requiring charitable bail funds who only pay cash bonds to comply with the surety licensing requirement would impose a number of

27

impractical obligations on charitable bail funds that bear no relationship to their activities.

110.   For example, the surety licensing requirement would force every individual, group, or entity "that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons" to establish and maintain a substantial "cash escrow account or other form of collateral." Ga. Code Ann. § 17-6-15(b)(1)(E). For the first 18 months, each county sheriff has total discretion to establish the amount that the entity must keep in the account. *Id.* After 18 months of operating in a county, the entity will have to maintain a cash escrow account of up to $1 million or five percent of the current outstanding bond liability faced by the company. *Id.*

111.   This cash escrow requirement makes sense for professional surety companies who, by submitting a surety bond, agree to potential future liability to the courts.

112.   But it does not make sense for charitable bail funds who pay full bond amounts in cash and therefore have already turned over the full dollar amount of their potential exposure.

113.   A charitable bail fund has every incentive to seek to recover its bail payment so that it can use those funds to further its charitable mission, including by posting additional cash bail payments.

114.    Maintaining a substantial cash escrow also would be impractical. Plaintiffs operate charitable funds with small budgets. They do not have surplus money to keep in a dedicated escrow account. And even if they had access to surplus money, forcing them to keep a large sum of money in an escrow account instead of spending it on their missions would force them to significantly curtail their charitable, religious, and expressive activities, including activities beyond charitable bail.

115.    The surety licensing requirement would also restrict charitable bail funds' work with volunteers, associates, or affiliates to further their advocacy work. The surety licensing regime requires a bondsperson to be a resident of Georgia for at least a year, "be a person of good moral character" (a term left undefined in the statute), be free of any felony convictions, and "remain[] in good standing with respect to all applicable federal, state, and local laws and all rules and regulations established by the sheriff in the county." Ga. Code Ann. § 17-6-50(b). It also requires that "[f]ingerprints and background checks of every individual" so employed be submitted to the county sheriff. Ga. Code Ann. § 17-6-15(b)(1)(D).

116.    These requirements not only impose significant barriers and ambiguous burdens on charitable bail funds' ability to operate, but also disqualify many of the people who are uniquely positioned to understand the

harms of and advocate against poverty-based incarceration—those with lived experiences as individuals impacted by the criminal legal system.

117.   Barred Business, for example, prides itself as a justice-impacted organization that was co-founded, and is led, by two leaders who have prior involvement with the criminal legal system. It remains an important part of Barred Business's identity—and a vital part of effectively voicing its message—to center justice-impacted people as leaders, employees, and volunteers to carry out its mission.

118.   Section 4's ban on felony convictions, however, would prohibit some of Barred Business's current team from continuing their bail fund work.

119.   Additionally, because of the professional surety licensing requirement, no one affiliated with a charitable bail fund would be permitted to "suggest or advise the employment of or name for employment any attorney or attorneys." Ga. Code Ann. § 17-6-51 (applying this requirement to bondspeople and their "agents" and "representatives").

120.   Charitable bail funds and those who carry out their work may want to assist the people they serve in securing legal representation.

121.   Moreover, under Section 4's requirements, charitable bail fund employees must undergo mandatory training approved by the Georgia Association of Professional Bondsmen, an association of for-profit surety

companies. Ga. Code Ann. § 17-6-50.1. Violation of these requirements is a crime. Ga. Code Ann. § 17-6-55.

122.   In addition to specific obligations set forth by state law, Senate Bill 63 will also require charitable bail funds to meet whatever "[a]dditional criteria and requirements" are "determined at the discretion of the sheriff." Ga. Code Ann. § 17-6-15(b)(1)(H).

123.   In order to obtain a professional surety license, therefore, a charitable bail fund will have to submit an application to the sheriffs in *every* county in which the fund "purports to be a charitable bail fund," provide whatever information is demanded by each sheriff, and pay applicable fees with every application. Ga. Code Ann. § 17-6-15(b).

124.   There is no time limit specified in state law by which the sheriff must act on the application.

125.   In addition to each sheriff's discretion to impose additional requirements on applicants, the sheriff also has total discretion to deny any application, *even if* it meets all enumerated requirements. Ga. Code Ann. § 17-6-15(b)(2) (providing that the law does not "require a sheriff to accept a professional bonding company or bondsperson as a surety"); *Bondsman, Inc. v. Taylor*, 367 Ga. App. 213, 218, 885 S.E.2d 249, 254 (2023) ("[A] first-time applicant cannot claim entitlement to a certificate of authority [to act as a professional bondsperson] even though he or she meets the minimum

31

standards proscribed by the governing statutes, rules, and regulations.");
*Open Bail Bonds, Inc. v. DeKalb Cnty.*, 129 F. App'x 522, 524 (11th Cir.
2005).

126.   Even if a charitable bail fund was able to obtain a license to
operate as a professional surety company in a county, the plain language of
the three-bond limit would still limit the bail fund to only posting three cash
bonds per year.

127.   These and other problems illustrate the incoherence of Section 4's
requirements. Under Section 4's language, an entity that "purports to be a
charitable bail fund" and solicits donations for use as cash bail will be forced
to register as a surety bonding company *even if* the entity never pays a single
surety bond. And they will seemingly have to so register in every county
where they so "purport to be a charitable bail fund."

128.   There is no rational reason for these requirements.

129.   Statements made by the sponsors of Senate Bill 63 confirm that
Section 4's restrictions on charitable bail funds further no legitimate
governmental interest, much less a strong or compelling one.

130.   For example, Senator Randy Robertson, one of the bill's sponsors,
assured his colleagues that Section 4 would lead to a "dramatic decrease" in
pretrial detention because it would enhance the ability of charitable bail
funds to provide bonds. Amanda Hernández, *Bail Clampdowns Don't Match*

*What Research Says About Suspects, Experts Say*, Stateline (Feb. 22, 2024),

https://perma.cc/4N78-S9AV ("Robertson, a Republican, argued that the bill

would also lead to a 'dramatic decrease' in the state's jail population because

it offers a pathway for organizations, such as churches and nonprofits, to set

themselves up as bail bonding companies.").

131.   Instead of making it easier, the language of Section 4

accomplishes precisely the opposite by severely restricting the number of

cash bail postings that charitable bail funds may make and rendering it

significantly harder (if not impossible) for charitable bail funds to operate by

*forcing* them to register as surety bond companies.

132.   If Section 4 goes into effect, Barred Business will risk criminal

prosecution if it continues its bailout campaign. Barred Business has already

posted three cash bonds this year and cannot post any further under Section

4 without risking criminal prosecution.

133.   Moreover, because Barred Business is not licensed as a surety

bonding company, it cannot solicit donations for charitable bail or otherwise

"purport[] to be a charitable bail fund" without risking prosecution. Even if

registering as a surety were not antithetical to Barred Business's mission by

forcing them to agree to serve in a role they believe is unjust, it would be

extremely difficult—if not impossible—for Barred Business to meet all of the

surety licensing requirements.

134.   As an organization led by justice-impacted individuals, for example, Barred Business likely would not satisfy the criminal history surety licensing requirement.

135.   Nor is it likely that Barred Business would be able to satisfy the escrow account requirements imposed by county sheriffs, which under the statute could be over a million dollars in each jurisdiction in which Barred Business will "purport[] to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons."

136.   Similarly, because Vodicka and Williams have each already posted three cash bail payments in their county, they will have to immediately stop making additional payments or risk criminal prosecution.

137.   Moreover, because Vodicka, Williams, and their bail fund are not licensed surety companies or professional bondspeople, starting July 1, they face criminal prosecution if they do anything that "purports" to be a charitable bail fund, forcing Vodicka and Williams to choose between practicing their faith and facing criminal liability.

## CAUSES OF ACTION

### Count I

### Free Speech (42 U.S.C. § 1983)

138.   Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully herein.

139.    The First Amendment's Free Speech Clause, which applies to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I.

140.    Section 4 violates the freedom of speech of Plaintiffs and others similarly situated in numerous ways.

141.    First, the three-cash-bail limit prevents the Plaintiffs and  others similarly situated from expressing their opposition to wealth-based pretrial detention by paying cash bail. The Free Speech Clause "affords protection to symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) ("[T]he First Amendment extends to all persons engaged in expressive conduct"). Expressive conduct is protected when there is an "intent to convey a particularized message" and "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018). The question is "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

142.    Donating to charitable causes is itself expressive conduct. *E.g.*, *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254

(11th Cir. 2021). And there are numerous additional expressive elements inextricably intertwined with the payment of charitable bail that would convey to a reasonable observer that it sends a message.

143.    Second, the surety licensing requirement imposes restrictions on any entity "that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons." These restrictions are triggered not by the actual payment of bail, but by pure expression: what an entity "purports to be" and their purpose in "soliciting donations" to be used for a particular charitable purpose.

144.    Soliciting donations for charitable causes is speech entitled to the highest level of protection under the First Amendment. *E.g.*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). By singling out soliciting donations for a particular cause, Section 4 constitutes a content-based regulation of speech subject to strict scrutiny. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (finding law that applied to professional fundraisers conducting charitable solicitation to be "content-based regulation of speech"). Indeed, by imposing restrictions only on solicitation of donations for a specific charitable purpose, Section 4 constitutes viewpoint-discrimination, a particularly egregious violation of the First Amendment. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995).

145.   Third, the surety licensing regime is an unconstitutional prior restraint on First Amendment-protected activities conducted by anyone who purports to be a bail fund. State law provides unlimited discretion to county sheriffs to deny any professional surety company application, even if the applicant meets all listed criteria. Ga. Code Ann. § 17-6-15(b)(2); *A.A.A. Always Open Bail Bonds, Inc. v. DeKalb Cnty.*, 129 F. App'x 522, 524 (11th Cir. 2005). By requiring those purporting to be a charitable bail fund to obtain this discretionary license prior to engaging in the First Amendment-protected activity of soliciting charitable donations, the surety licensing requirement poses a textbook example of a prior restraint.

146.   There is a "long line of precedent" recognizing that "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (collecting cases). Indeed, nearly 70 years ago, the Supreme Court struck down on First Amendment grounds a law that required "soliciting" organizations to first obtain a discretionary license. *Staub v. City of Baxley*, 355 U.S. 313 (1958). Applying the discretionary professional surety licensing requirements to the First Amendment-protected activities of charitable bail funds violates this well-established doctrine, and is facially unconstitutional. *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310

(11th Cir. 2003) (en banc) ("A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional.").

147.   Even if sheriffs were required to approve any applicant who met all professional surety requirements, the requirements are written so vaguely that they effectively give a county sheriff unfettered discretion to deny an applicant. For example, requiring that any person working as a bondsperson be a person of "good moral character" is not sufficiently defined *E.g.*, *Schneider v. Town of Irvington*, 308 U.S. 147, 158 (1939) (striking down law that required canvassers to first obtain a permit that would be denied if the Chief of Police determined that "the canvasser is not of good character or is canvassing for a project not free from fraud"). And there is no time limit specified in the statute by which the sheriff must make the determination. *E.g., Riley*, 487 U.S. at 802; *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1222 (11th Cir. 2017). These further defects confirm that applying the surety licensing requirement to organizations "purport[ing] to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons" is an unconstitutional prior restraint.

148.   Fourth, the surety licensing requirements impose additional restrictions on the free speech of charitable bail funds that are subject to their requirements. For example, Ga. Code Ann. § 17-6-51 will now prohibit

charitable bail funds from offering basic advice and assistance to help arrestees obtain counsel. Yet offering advice and recommendations about attorneys who might represent them is protected speech. *Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 6 (1964). Restricting a charitable bail fund from advising the arrestees it seeks to help about legal representation is a content-based restriction on speech that furthers no compelling state interest and fails strict scrutiny.

149. Although these content-based restrictions trigger at least strict scrutiny, they fail even intermediate scrutiny. None of these intrusions on the expressive rights of Plaintiffs and other charitable bail funds are justified by a narrowly tailored, sufficiently weighty government interest. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 490 (2014).

150. Therefore, facially and as applied to Plaintiffs, the restrictions contained in Section 4 violate the First Amendment as an unconstitutional infringement on freedom of speech.

## Count II

### Freedom of Association (42 U.S.C. § 1983)

151. Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully herein.

152. The First Amendment's protection of the freedom of association, which applies to the states through the Fourteenth Amendment, provides

"protection to collective effort[s] on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court has noted, "[p]rotected association furthers a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (*APF*).

153.   Freedom of association protects not only "advocacy groups" but *any* group that "engage[s] in some form of expression, whether it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

154.   Plaintiffs and others similarly situated engage in numerous forms of expression, both publicly and privately, including advocacy for the end of wealth-based pretrial detention, educating the public about pretrial detention, and seeking and obtaining donations. Moreover, when bailing someone out of jail, Plaintiffs greet that person and celebrate their freedom.

155.   Further, Plaintiff Barred Business's payment of cash bail allows it to build impactful relationships with people who are released and their loved ones, welcoming them into the Barred Business family and often having them serve as ambassadors for Barred Business's charitable and expressive goals. Plaintiffs Vodicka and William associate with one another

and with others around their payment of cash bail and related advocacy,

which they believe are critical exercises of their religious faith.

156.   Moreover, the Supreme Court has specifically held that

"collective activity undertaken to obtain meaningful access to the courts is a

fundamental right within the protection of the First Amendment." *In re

Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar

of Mich.*, 401 U.S. 576, 585 (1971)). And "freedom before conviction permits

the unhampered preparation of a defense," *Stack v. Boyle*, 342 U.S. 1, 4

(1951), including making it easier to "consult [with one's] lawyer in private,"

S. Rep. No. 89-750, at 7 (1965). By securing arrestees' pretrial freedom,

Plaintiffs' bail funds have the purpose and effect of facilitating the arrestee's

effective access to counsel and enhancing the arrestee's ability to navigate the

criminal legal system.

157.   Defendants' restrictions on the activities of charitable bail funds

impede Plaintiffs' right to associate.

158.   Defendants' restrictions on association do not advance a

substantial state interest with sufficient precision to withstand constitutional

scrutiny.

159.   Therefore, facially and as applied to Plaintiffs, the restrictions

contained in Section 4 violate the First Amendment as an unconstitutional

infringement on freedom of association.

## Count III

### Free Exercise of Religion (42 U.S.C. § 1983)

160.   Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully herein.

161.   Plaintiffs Vodicka and Williams's involvement with the charitable bail fund and their payment of cash bail is an important expression of their sincerely held religious beliefs.

162.   By making it a crime to pay more than three cash bail payments in a year, and by subjecting Vodicka and Williams's bail fund to onerous surety licensing requirements , Senate Bill 63 infringes Plaintiffs' free exercise of their religion.

163.   Section 4 is not a law of neutral and general applicability. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis in original).

164.   First, by singling out the payment of cash bail for restrictions that are not applied to comparable surety bonds paid for by for-profit companies, Section 4 fails the general applicability requirement. *See, e.g.*, *id.*; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) ("A government policy will fail the general applicability requirement if it 'prohibits religious

conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'").

165.   Further, requiring that Plaintiffs submit to a highly discretionary licensing regime before they can exercise their religion is not a law of neutral and general applicability. *See, e.g., Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021) (holding that a law that vested discretion in the decisionmaker was not generally applicable).

166.   By burdening Plaintiffs' free exercise and not being a law of general applicability, Section 4 is "examined under the strictest scrutiny." *Fulton*, 593 U.S. at 541. Section 4 is therefore unconstitutional unless the State can establish that "it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Id.* (citation omitted).

167.   Defendants do not have any compelling state interests that would justify Section 4, much less any compelling interests that are narrowly tailored to the restrictions imposed by Section 4.

168.   Therefore, as applied to Plaintiffs Vodicka and Williams, Section 4 violates Plaintiffs' free exercise rights and is unconstitutional under the First Amendment.

## Count IV

### Due Process – Vagueness (42 U.S.C. § 1983)

169.   Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully herein.

170.   The Due Process Clause prohibits the State from imposing criminal penalties on conduct proscribed using vague language. A law is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  These problems are particularly concerning in the First Amendment context, as lack of notice and the prospect of discriminatory enforcement can chill protected speech.  *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). And the criminal nature of the provision amplifies the constitutional problem with failing to provide clear guidance. *See, e.g.*, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982).

171.   Section 4's terms are both sweeping and indecipherable. For example, Section 4 imposes surety bond company requirements upon "[e]very individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons." The law does not further define what it means to "purport[]" to be a charitable bail fund,

44

and fails to provide guidance about in which county or counties an entity so "purport[ing]" must register as a surety bond company.

172.   The cash bond limit is similarly ambiguous, prohibiting any "group" from posting more than three cash bonds "per year . . . in any jurisdiction." The law does not define what "jurisdiction" is. And by imposing a limit that applies to bonds posted in "any jurisdiction," instead of "per" jurisdiction, the law appears to count towards its limit bond payments made anywhere in the state, and perhaps beyond.

173.   Both sentences of Section 4 apply criminal penalties to "group[s]," but fail to define what constitutes a "group." Thus, for example, if multiple members of the same church each post three cash bails in a year, are they, or the church, subject to criminal prosecution for constituting a "group" that has violated the three-cash-bail limit?

174.   Section 4's failure to articulate with sufficient clarity what conduct is proscribed has the effect of chilling constitutionally protected activity of Plaintiffs and others.

175.   Therefore, Section 4 is unconstitutionally vague in violation of the Due Process Clause.

## Count V

### Excessive Bail Clause (42 U.S.C. § 1983)

176.   Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully herein.

177.   The Eighth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII. The Excessive Bail Clause requires that any bail imposed on an individual "not be 'excessive' in light of the perceived evil" that it is designed to address. *United States v. Salerno*, 481 U.S. 739, 754 (1987).

178.   A law violates the Excessive Bail Clause if it imposes a condition on pretrial arrestees "for a purpose other than that for which bail is required to be given under the Eighth Amendment." *United States v. Rose*, 791 F.2d 1477, 1480 (11th Cir. 1986); *see also Campbell v. Johnson*, 586 F.3d 853 (11th Cir. 2009).

179.   Section 4 amends a state statutory provision authorizing bail, § 17-6-15, with the intent and effect of making access to bail more difficult. By restricting the ability of charitable bail funds to provide the necessary funds needed to secure indigent individuals' release, Section 4 prevents those individuals from making bail for reasons that have nothing to do with the purposes for which bail may be required.

180.   Because Section 4 operates to restrict bail for purposes other than the reasons for which bail may be restricted, it violates the Excessive Bail Clause.

## Count VI

### Equal Protection Clause (42 U.S.C. § 1983)

181.   Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully herein.

182.   The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

183.   Equal protection means that the government cannot arbitrarily or irrationally subject similarly situated people to different rules.

184.   Section 4's arbitrary cap on the number of charitable cash bail payments an entity can make, while allowing an unlimited number of for-profit surety bonds, subjects non-profit charitable bail funds that tender payment in full to more severe restrictions than for-profit bonding companies that tender partial payment.

185.   There is no government interest that is furthered by preferencing surety bonds over cash bail payments, or for-profit companies over nonprofit organizations.

186.   Section 4's irrational rules violate the Equal Protection Clause.

# REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and:

1) Declare that Section 4 of Senate Bill 63 is unconstitutional.

2) Issue a preliminary and permanent injunction enjoining Defendants—including their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction—from taking any action to enforce or implement Section 4 of Senate Bill 63.

3) Award Plaintiffs reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

4) Grant Plaintiffs such other relief the Court deems just and proper.

Respectfully submitted this 21st day of June, 2024,

/s/ *Cory Isaacson*
Cory Isaacson,
      Ga. Bar No. 983797
Andrés López-Delgado,
      Ga. Bar No. 552876
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA
P.O. Box 570738
Atlanta, GA 30357
Phone: (770) 415-5490
cisaacson@acluga.org
adelgado@acluga.org

/s/ *Joseph Mead*
Rupa Bhattacharyya*
Shelby Calambokidis*
Alex Lichtenstein*
Joseph Mead*
William Powell*
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 662-9042
jm3468@georgetown.edu

*Attorneys for Plaintiffs*
**Application for admission pro hac vice forthcoming*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, I hereby certify that this brief has been prepared in Century Schoolbook, 13-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

<u>/s/ Cory Isaacson</u>
Cory Isaacson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 21, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. There is currently no Counsel of Record for Defendants; I certify that I will serve the foregoing on Defendants along with the Complaint.

<u>/s/ Cory Isaacson</u>
Cory Isaacson