## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| BARRED BUSINESS, JOHN COLE VODICKA, and STEVEN WILLIAMS, | |
|       Plaintiffs, | Civil Action No. 1:24-cv-2744-VMC |
| v. | |
| BRIAN KEMP, Governor of Georgia; CHRISTOPHER M. CARR, Attorney General of Georgia; KEITH E. GAMMAGE, Solicitor General for Fulton County; and WILL FLEENOR, Solicitor General for Athens-Clarke County, | |
|       Defendants. | |

## PRELIMINARY INJUNCTION

This is a constitutional challenge to Section 4 of Georgia Senate Bill 63 (2024 Georgia Laws Act 507), O.C.G.A. § 17-6-15(b)(4)–(6) (2024) (the "Act"). The Act limits "any individual, corporation, organization, charity, nonprofit corporation, or group" to posting no more than three cash bonds "in any jurisdiction," (the "Bond Limit") and requires every "individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons" to submit to the same requirements as professional surety companies (the "Surety Requirement").

Plaintiffs filed their Motion for Temporary Restraining Order and Expedited Preliminary Injunction ("Motion," Doc. 2) on June 21, 2024. Defendants Brian Kemp and Christopher M. Carr (collectively, the "State") filed a Response to the Motion ("Response," Doc. 26) on June 27, 2024.[1] The Court previously entered a Temporary Restraining Order against enforcing the Act after a hearing on June 28, 2024 ("TRO Hearing"). (Doc. 34). At the TRO Hearing,

> the Court noted certain areas of Plaintiffs' alternative arguments required further evidentiary development and asked the parties whether they would prefer this matter be set down for a hearing prior to the entry of a preliminary injunction, whether the Court should receive additional briefing and documentary evidence, or whether the Court should enter a preliminary injunction solely on the bases identified at the hearing."

(*Id.*). The Court noted that "[t]he parties requested that they be able to confer on the matter, and are directed to contact the Court's chambers by July 3, 2024 with their positions." (*Id.*). The Parties emailed their positions to chambers, and the Court permitted Plaintiffs to submit supplemental affidavits pursuant to Federal Rule of Civil Procedure 43(c). The State did not file any response to the supplemental affidavits.

For the reasons that follow, the Court now enters a preliminary injunction against further enforcement of the Act during the pendency of this litigation.

---

[1] The remaining Defendants did not file a response to the Motion.

## Background

### I.   Barred Business Foundation

Plaintiff Barred Business Foundation is a nonprofit organization that "seeks to heal, activate, resource, and build power and self-determination amongst justice-impacted people, their loved ones, and their communities." (Doc. 5-1 ¶ 2). It was co-founded by Bridgette Simpson, who also serves as Barred Business's Executive Director. (*Id.* ¶ 10).

One of Barred Business's activities is participating in "bail out campaigns": organized events during which its members pay cash bail for many people who are being held in pretrial detention. (Doc. 36-1 ¶ 2). Through these "bail out campaigns," they seek to bring attention to the more than half-million people in jail who have not been convicted of any crime, but do not have the money to post bail. (*Id.*). For example, through the Black Mamas Bail Out campaign, its members seek to free as many Black mothers and caregivers as they can by paying their cash bail so that they can spend Mother's Day with their families and in their communities. (*Id.* ¶ 3). This campaign not only expresses the members' opposition to unnecessary detention, but emphasizes their belief that mothers belong with their families in their community. (*Id.*).

When someone is bailed out, a group of Barred Business members and volunteers will wait (all day—or night—if needed) in the parking lot outside the

detention centers, in full view of staff and visitors, in order to celebrate the person's release and welcome them back into the community. (*Id.* ¶ 4). They are often joined by family members of detainees. (*Id.*). The events often involve sharing stories about the detainees and may be streamed live on social media. (*Id.*).

Barred Business members and volunteers typically wear a Barred Business or Black Mamas Bail Out shirt so that people know who they are and why they are there. (*Id.* ¶ 5). They also often hold signs and posters or distribute flyers that further convey their message that "the love and support of your community will set you free—even from mass incarceration." (*Id.*). Below are photographs of Barred Business members waiting to greet those bailed out as part of their campaign:

 

 

(*Id.*).

Ms. Simpson described the moment a person leaves detention as a "beautiful and powerful one":

> For that short period of time, the parking lot outside the detention center is transformed into a magical place. Barred Business publicly welcomes each bailee right at the curb in front of the detention center, greeting them warmly, with open arms and plenty of hugs. It is a celebratory, emotional, and powerful moment. While volunteers clap and cheer, family members are often brought to tears as they embrace their loved one.
>
> . . .
>
> Over the years, we have greeted people with a bouquet of flowers, balloons, and gift bags filled with necessities. These efforts send their own message. Because people are dehumanized in jail, we welcome them with dignity, treating them like the valuable members of the community they are. Sometimes that means welcoming them with symbols of affection, like a bouquet of beautiful flowers. Other times dignity comes in the form

> of giving a stick of deodorant to someone who has not
> had access to a clean shower or bathroom in weeks.

(*Id.* ¶¶ 6–7).

Barred Business's members are always accompanied by their big van, which they use to offer rides to ensure that those they bailed out get where they need to go safely and perform a needs assessment for each individual being released right there in the parking lot, often on the hood of a car, making sure they know how best to support them moving forward. (*Id.* ¶ 7). Ms. Simpson contends that it is "clear to anyone passing by that we are there to support those being released and rejoice in the moment when families are reunited." (*Id.* ¶ 8).

Barred Business also engages in events to promote its message at venues other than jails. (*Id.* ¶¶ 10–14). It shares videos and pictures of these events on social media feeds to bring attention to the ongoing family separations happening because of pretrial detention. (*Id.* ¶ 15). It also organizes bail out campaigns partnering with other organizations who pay the cash bail in connection with particular campaigns. (*Id.* ¶¶ 16–17). As with its own campaigns, in these campaigns Barred Business members organize and promote the event, help to select who will be bailed out, camp out and welcome people when they are released at the detention center, and provide gift bags of basic necessities. (*Id.*). The gift bags include a letter to make sure that folks stay in touch with them and can access wraparound services. (*Id.* ¶ 17).

6

In the longer term, "each person who is bailed out is welcomed into the Barred Business family." (*Id.* ¶ 18). That family includes people who have been impacted by the justice system, including Ms. Simpson who was previously convicted of a felony. (Doc. 5-1 ¶ 1). Barred Business provides a variety of services to help people succeed, including a year-long program that provides training, political education, leadership development, housing, and wraparound programming and support for formerly incarcerated Black women who are returning to their communities. (Doc. 36-1 ¶ 18). Barred Business provides not only social services and financial support, but moral and emotional support as well. (*Id.*).

When a person who has been bailed out appears in court, Barred Business representatives also attend, in matching T-shirts, eager to talk to the judges and demonstrate the community's support for the person who has been bailed out. (*Id.* ¶ 19). They call this effort "court mobbing," and typically have five to ten people show up in court, depending on the day. (*Id.*).

Barred Business solicits donations for its bail out campaigns in a variety of ways. (*Id.* ¶ 22). For example, it solicits donations on its website, and distributes flyers at rallies and events. (*Id.*). Members purposefully solicit donations in small amounts such as $5 so that more people in their community feel empowered to add their voices to their fight against unjust pretrial detention. (*Id.*). It often

broadcasts its events live on social media from outside detention centers as its members welcome people back to the community and embrace them with loving arms. (*Id.* ¶ 23).

Barred Business typically bails out more than three people each year in Fulton County alone. (*Id.* ¶ 27). Members do not know whether cash bail payments made by volunteers and coalition partners would count towards Barred Business's three-bail limit, or vice versa. (*Id.*). They also do not know what it means to "purport[] to be a charitable bail fund," and do not know in which jurisdictions Senate Bill 63 would require it to attempt to register. (*Id.*).

## II.    John Cole Vodicka

Plaintiff John Cole Vodicka is a member of Oconee Street United Methodist Church (the "Church") in Athens, Georgia. (Doc. 36-2 ¶¶ 1–2).[2] He coordinates the charitable bail fund that is administered by the Church's Justice & Outreach Committee. (*Id.* ¶ 2). The bail fund was started in 2021. (*Id.* ¶ 3). Members of the congregation who were engaged in the Church's court-watching program noticed that people were being held in pretrial detention for extended periods of time on very small bail amounts because they could not afford to pay. (*Id.*). After the death of George Floyd, they were inspired to create a bail fund as a concrete step that

---

[2] Plaintiff Steven Williams volunteers alongside Plaintiff Vodicka with the bail fund affiliated with the Oconee Street Church. (Doc. 1 ¶ 37).

they could take to oppose perceived overreaches of the criminal legal system. (*Id.*). The Church set aside money to be used for bailing people out. (*Id.*).

Mr. Vodicka has spent hundreds of hours volunteering for the bail fund, including posting cash bail for many dozens of people held in the Athens-Clarke County Jail. (*Id.* ¶ 5). He knows that other members of the congregation sometimes pay cash bail, too. (*Id.*).

Mr. Vodicka has made well over 3 cash bail payments already this year. Since SB 63 was signed, he posted 10 cash bail payments. (*Id.* ¶ 6). The individuals had spent a collective 462 days in jail. (*Id.*). All were charged with misdemeanors; the highest bail amount of that group was $150. (*Id.*).

Mr. Vodicka avers that those involved in the criminal legal system know that his charitable bail work is driven both by his faith and his opposition to poverty-based detention, and that every judge in the courthouse is familiar with him and the Church's bail work. (*Id.* ¶ 7). Public defenders, judges, and law enforcement have all asked him to bail out individuals. (*Id.*).

According to Mr. Vodicka, "[p]aying cash bail for a person is not a short process":

> Once I learn about somebody who I think I can help, I arrange to get the exact dollar amount that I need for the bail payment. I head to the jail, where I sign in, noting my affiliation with the Oconee Street United Methodist Church. I engage in a number of conversations with various jail officials to arrange the release of the person I

am bailing out. Throughout these conversations, jail staff know that I am there because of my service with the Church and the charitable bail fund.

It is an important part of our bail out process to "walk with" each person, demonstrating love and support for the person bailed out. When a person is released, I greet them inside the jail, and introduce myself and explain why I am there. I provide my contact information, and I see what immediate needs they have. I will offer them a ride, or money for a meal, or other help that they might need. I have taken people to health care appointments and to their lawyer's office.

(*Id.* ¶¶ 8–9).

Mr. Vodicka maintains contact with former detainees, sometimes even after their case is resolved. (*Id.* ¶ 9). He typically arranges to call the person bailed out to remind them of their next court hearing and offers to give them a ride to court to make it easier for them to attend. (*Id.* ¶ 11). He not only physically accompanies them to their court dates, but also develops a relationship with the individual, making sure they know that they have someone in the community to contact if they need reassurance or support in advance of their court dates. (*Id.* ¶ 10). He often appears in court with the person he has bailed out to support them. (*Id.* ¶ 12). Most judges express their appreciation that he accompanies the person he has bailed out to court. (*Id.*).

Mr. Vodicka provides a report of his expenditures and who he bailed out to the Church's Justice & Outreach Committee. (*Id.* ¶ 13). He and the committee share

information about the number of people they have bailed out with the congregation through announcements during Church services and information in their Church bulletin. (*Id.*). He has also addressed the Church, talking about his experience bailing people out and the lessons that illustrates both for the Biblical call to love one's neighbor, and the problems with unneeded pretrial detention. (*Id.*).

Mr. Vodicka's writings on these issues have been published in magazines and newsletters. (*Id.* ¶¶ 15–16). In response to Mr. Vodicka's writings on these issues, people have sent money donations to be used for charitable bail. (*Id.*). Mr. Vodicka asserts that Section 4 of Senate Bill 63 would make it more difficult for him to practice his faith and express his opposition to poverty-based detention. (*Id.* ¶ 17). It would also effectively eliminate his ability to have conversations with people recently bailed out, to offer them support as they continue to navigate the criminal legal system, and to engage with their lawyers, judges, and others to help them succeed. (*Id.*).

### Legal Standard

A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A district court has broad discretion to grant injunctive relief if the movant shows: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the

threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). The third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)). "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

## Discussion

Plaintiffs raise separate challenges to the Bond Limit and to the Surety Requirement, which are respectively the first and second sentences of the Act. A violation of either part of the Act constitutes a misdemeanor under Georgia law. O.C.G.A. § 17-6-15(b)(6) (2024). The Court considers Plaintiffs' likelihood of success as to their challenges against each sentence in turn, and then considers the remaining injunctive relief factors.

## I.    The Bond Limit – Facial Vagueness Challenge

The Bond Limit provides: "No more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit

12

corporation, or group in any jurisdiction." O.C.G.A. § 17-6-15(b)(4) (2024). Plaintiffs raise both facial and as applied constitutional challenges to the Bond Limit in their Complaint (*see* Doc. 1 ¶¶ 150, 159, 168) but focus on two for present purposes: freedom of expression under the First Amendment and vagueness under the Due Process Clause. (*See* Doc. 2-1 at 3 n.1). The Court ruled that the Bond Limit violated the Due Process Clause from the bench at the TRO Hearing; this opinion memorializes the Court's ruling.

Also at the TRO Hearing, the Court found that Plaintiffs had not met their burden to show that posting cash bond was expressive conduct under the First Amendment. Plaintiffs filed supplemental declarations and ask the Court to consider them in revisiting this aspect of the ruling. The Court reaches this argument in the following Section.

### A.    Background for Fourteenth Amendment Vagueness Challenges

Plaintiffs contend that the Bond Limit is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause. As the Supreme Court wrote in *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." The Court explained that "[v]ague laws offend several important values," including failing to "give the person of ordinary intelligence a reasonable opportunity know what is prohibited," inviting "arbitrary and discriminatory

enforcement," and chilling lawful conduct such as speech by causing citizens to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).

"To overcome a vagueness challenge, statutes must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'must provide explicit standards for those who apply them.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Grayned*, 408 U.S. at 108). The "degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Id.* (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). "In particular, the Court has 'expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" *Id.* (quoting *Vill. of Hoffman Estates* 455 U.S. at 498–99).

## B.    Application to the Bail Limit

Plaintiffs contend that two aspects of the Bail Limit[3] are unconstitutionally vague: the word "group" and the word "jurisdiction." At the TRO Hearing, the

---

[3] Restated for reference: "No more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit corporation, or group in any jurisdiction." O.C.G.A. § 17-6-15(b)(4) (2024).

Court focused on the term "group." Plaintiffs argue that "the law fails to define 'group,' potentially subjecting any like-minded individuals who pay charitable bail in tandem to criminal penalties." (Doc. 2-1 at 23). The State responds that "a court may cure a law's vagueness by statutory interpretation." (Doc. 26 at 2) (quoting *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982)). At the TRO Hearing, the State explained that "group" is a catch-all for other organizations:

> It is pretty clear, I believe, that the legislative intent when they used the term "group" in this scenario was to capture anything that was left out of individual organization, charitable -- I mean, there's a -- then there's the kind of catchall term that potentially means if we've left you out and you are a group, then we mean you too.

(Transcript of TRO Hearing at 17:5–10 ("Tr."), Doc. 37). Alternatively, the State seemed to imply at the TRO Hearing that the Bond Limit's reference to an "individual, corporation, organization, charity, nonprofit corporation, or group" may be limited to individuals engaged in charitable bail work:

> MS. CROWDER:  . . . [The] Court has noted and the statute makes clear, the individuals are not permitted to post any more than three cash bonds, neither are sureties, neither are organizations, neither is anybody else. That's one portion. Nobody is permitted to post any more than three cash bonds in any jurisdiction in the state.
>
> THE COURT: So would a mother not be able to cash out four of her children, bond out four of her children who may have been arrested for the same incident?

15

> MS. CROWDER: If she's using her own money, of course she can. That's her money. She can do what she wants with her own money, but this is a different kind of scenario. These are not -- these are individuals who are posting cash bonds, and the source of those funds are coming from different places.

(Tr. 19:2–18). In any case, in their Response brief, the State argued that "Plaintiffs cannot complain that the term 'group' is vague when they clearly fit within the other enumerated parties to which the regulation applies, i.e., individuals and nonprofit corporations." (Doc. 26 at 22 n.4) (citing *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1271-1272 (11th Cir. 2011)).

The Court first addresses the State's argument that "group" should be defined by reference to the other listed entities in the Bond Limit — "individual, corporation, organization, charity, nonprofit corporation." The State essentially invites the Court to invoke the *ejusdem generis* canon to narrow the meaning of "group." The problem is that the "'inference embodied in *ejusdem generis* [is] that Congress remained focused on [some] common attribute' shared by the preceding list of specific items 'when it used the catchall phrase.'" *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 461–62 (2022) (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008)). An "individual" is not a type of organization and so *ejusdem generis* cannot be used to narrow "group" to types of organizations. Instead, in passing on Plaintiffs' vagueness challenge, the Court must apply the "common and ordinary meaning, absent some established technical definition, unless the legislature

16

intended otherwise." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982).

The plain meaning of group is one or more persons or objects. "Group." *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/group (last visited July 2, 2024) ("2a: a relatively small number of individuals assembled or standing together . . . b: an assemblage of objects regarded as a unit because of their comparative segregation from others"). A "group" can also be defined as "a number of individuals bound together by a community of interest, purpose, or function" and "a combination of companies or other enterprises having interlocking interests or a single owner or management." *Id.* definitions 3a, 3e. Plainly, the definition of "group" in the Bond Limit covers one or more individuals and therefore facially covers the individual Plaintiffs. But "group" could also include a "group" of corporations, congregations, or other entities, and therefore also appears to cover Plaintiff Barred Business.

To illustrate why the Bond Limit's expansive use of "group" poses vagueness problems, the Court provides some examples. For the first example, the Court returns to the hypothetical mother seeking to post cash bond for her four children referenced at the TRO Hearing. Applying the word "group" only complicates the scenario. If the concerned mother turns to another family member

to bond out the fourth child, they have formed a group and are now collectively subject to the three-bond limit.

The second example the Court gave at oral argument is where two or more members of the same congregation post three cash bonds from their personal funds. The State seemed to imply at the TRO Hearing that whether the individuals formed a "group" in violation of the law depends on whether the congregants acted in concert:

> THE COURT: What if you have -- so a group to me means at least more than one –
>
> MS. CROWDER: Right.
>
> THE COURT: -- so what if you have two individuals who are members of the same church? Would that be a group?
>
> MS. CROWDER: Not unless in addition to being members of the church, they are also acting in concert and soliciting and doing all of the things that this legislation targets.
>
> . . .
>
> THE COURT: So if two members of the same church just happen to show up on the same day at the jail to bond people out, would that be a group?
>
> MS. CROWDER: No, that would not. No, they would not be a group. If they happen to -- happenstance brought them at the same place at the same time, no. If they talk to each other and they planned and they met and they discussed and they planned to meet and go as a unit into the jail for the purpose, then, yes, I would say that would constitute a group.

18

(Tr. 17:15–18:13). And while that is one possible reading of the term "group," there is nothing in the Bond Limit indicating that any concerted action is necessary to constitute a "group." Indeed, the Bond Limit and the broader Act lack a mens rea element of any kind. *But see High Ol' Times, Inc.*, 673 F.2d at 1229 ("The Supreme Court has held that the inclusion of a specific mens rea element may alleviate a law's vagueness with respect to providing fair notice to the accused that certain conduct is prohibited."). Absent a mens rea element, it seems plausible that a prosecutor could bring charges against two members of the same group who collectively but unwittingly violated the Bond Limit. This scenario invites "arbitrary and discriminatory enforcement," a possibility only magnified by the fact that the Act gives "[p]rosecuting attorneys and the Attorney General . . . concurrent authority to prosecute any violation of" the Bond Limit or Surety Requirement. *Grayned*, 408 U.S. at 108; O.C.G.A. § 17-6-15(b)(5) (2024).

The State offered a second saving construction for the Act: that the Bond Limit only applies to charitable bail work. This interpretation is the only way the Court can square the State's answer to its question about the mother being free to bail out her four children above with the text of the statute. Stated another way, the Court considers if the Bail Limit's reference to "individual, corporation, organization, charity, nonprofit corporation, or group" can be limited by reference to the Surety Requirement's similar reference to "individual, corporation,

organization, charity, nonprofit corporation, or group" with the additional criterion that such individual or entity "purport[s] to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons."

There are canons of construction that lend superficial support to this argument. First, the whole-text canon "refers to the principle that a 'judicial interpreter [should] consider the entire text, in view of its structure and of the physical and logical relation of its many parts,' when interpreting any particular part of the text." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 24, at 167 (2012)). Second, there is the "presumption of consistent usage—the rule of thumb that a term generally means the same thing each time it is used." *United States v. Castleman*, 572 U.S. 157, 174 (2014).

There is also a surface appeal to this interpretation because it would avoid other constitutional issues. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (constitutional avoidance canon).  For example, because the Bond Limit appears to apply to any individual regardless of their connection to the detainee, it may even apply to bonds posted by the individual on their own behalf. This is particularly problematic because many traffic and municipal ordinance violations are disposed of by the posting of and forfeiture of cash bonds in lieu of

appearances. O.C.G.A. §§ 15-10-63.1, 17-6-10, 40-13-58; *see also Agic v. Metro. Atlanta Rapid Transit Auth.*, 780 S.E.2d 79, 81 (Ga. Ct. App. 2015) (paying a fine on a citation and not appearing in court equivalent to a cash bond forfeiture). Most troublingly, it would appear to apply to a person who posted bond on their own behalf if they were arbitrarily arrested, posted their own cash bond, and later had the charges dropped by a prosecutor. The State's interpretation of the law would allow a person who has posted three cash bonds for another person in a jurisdiction to pay a cash bond on their own behalf for a subsequent offense in the same jurisdiction, eliminating due process concerns. *Cf. Jennings*, 583 U.S. at 296. Moreover, because corporations act through individuals but the Bond Limit does not distinguish between individuals who post bonds with their own funds and with corporate funds, the State's interpretation may not prohibit an individual who posts a cash bond with funds provided by the corporation from later posting a bond on their own behalf.

But as Plaintiffs pointed out at the TRO Hearing, the plain language of the statute applies the Bond Limit to any individual or entity regardless of the purpose of posting the bond, and when "a wooden application of the canons would supplant rather than supply ordinary meaning" the Court "remain[s] obligated to the text—not to what the canons might suggest about the text." *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022). Moreover, if there was a charitable purpose

limitation to the Bond Limit as in the Surety Requirement, it seems likely that the General Assembly would have said so. If anything, it appears the General Assembly meant the opposite, criminalizing violation of "any part of [the] paragraph" O.C.G.A. § 17-6-15(b)(6) (2024), implying that both parts of the Act stand alone.

The Court is thus left with two competing, but reasonable interpretations. The State's reading potentially avoids constitutional issues that would stem from prohibiting a person from posting cash bond on behalf of themselves or family members solely because they had engaged in charitable bail work within that jurisdiction that year[4] while Plaintiffs' interpretation runs headlong into these issues. The Bail Limit as written thus fails to give a person of ordinary intelligence reasonable notice whether if they post three cash bonds for another person in any jurisdiction out of charity, they may be subject to prosecution for later posting a bond for themselves (including in connection with a traffic offense or ordinance violation) or for a family member. *Grayned*, 408 U.S. at 108 (1972). These issues are magnified by the statute's lack of a mens rea element.

---

[4] But this interpretation raises its own constitutional concerns because it would be subject to Plaintiffs' First Amendment Challenge, discussed below. So, if the Court erred by failing to adopt the State's limiting construction to cure any vagueness in the Bond Limit, the Court would enjoin the Bond Limit for the same reasons it enjoins the Surety Requirement.

Because the Act fails to fairly notify any legal person whether they will be subject to prosecution for posting bonds for both charitable and non-charitable purposes, the law is thus vague even as to individuals and nonprofit corporations. And because any legal person posting cash bond could be unknowingly swept into the Bond Limit's reach by the term "group," the law is unconstitutionally vague in all applications and the Court therefore sustains Plaintiffs' facial challenge.

Separate from the above reasoning but as an additional basis for sustaining a facial challenge to the Act, the Supreme Court has permitted facial challenges where vague criminal laws containing no mens rea element infringe on constitutionally protected rights. *City of Chi. v. Morales*, 527 U.S. 41, 53–55 (1999). As the Court will explain further in Part II.B. below, the practice of posting cash bonds for others is intimately interwoven with the history of this nation and developed alongside several constitutionally protected rights, including the right against excessive bail as well as due process protections for the right to "dispose of [one's] property [as one] s[ees] fit," *Buchanan v. Warley*, 245 U.S. 60, 81 (1917) and the right to due process before deprivation of liberty—particularly where the law could preclude an individual from posting their own cash bond in the event they or a group they were affiliated with had already posted three cash bonds for other persons. Considering this historical pedigree, due process requires at a

minimum that laws criminalizing charitable bail work be written unambiguously enough to provide clear notice of what conduct they prohibit. *Cf. Cramp v. Board of Pub. Instruction*, 368 U.S. 278, 287 (1961) ("The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution.").[5] For all these reasons, it is appropriate to enjoin the Bond Limit in all applications. The Court need not reach Plaintiffs' alternate vagueness challenge to the term "jurisdiction."

## II.    The Bond Limit – As-Applied Expressive Conduct Challenge

Plaintiffs, as an additional ground to challenge the Act, contend that the Bond Limit unduly restricts their expressive conduct. (Doc. 2-1 at 9).[6] Specifically, they argue that when they "pay cash bail on behalf of someone incarcerated due to their poverty, they do so not only to secure the release of one individual, but to

---

[5] The fact that states did not criminalize a longstanding practice "does not mean that anyone thought the States lacked the authority to do so," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 217 (2022), but it also implies no one conceived the practice was subject to criminalization until now. In any case, the longstanding nature of charitable bail work which developed alongside other clearly enumerated rights of liberty and against excessive bail provide an analogous foundation for carefully parsing the Act.

[6] The Court does not reach Plaintiffs' free exercise challenge, though the Court notes that the Supreme Court in recent years has trended toward viewing challenges to laws restricting religiously-motivated expressive conduct under the free speech framework rather than under the free exercise framework. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023).

express their position on an issue of public concern: the injustice of poverty-based pretrial detention." (*Id.*). Determining whether distributing resources "can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) (quoting *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006)).

### A.   Background for Expressive Conduct

"The First Amendment literally forbids the abridgment only of 'speech,'" but the Supreme Court has "long recognized that its protection does not end at the spoken or written word[;] . . . conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Wash.*, 418 U.S. 405, 409 (1974)).

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Court must determine "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence*, 418 U.S. at 410–11). To be clear, "in determining whether conduct is expressive," the Court need only consider

25

"whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004); *see also Hurley v. Irish– Am., Gay, Lesbian & Bisexual Grp. of Boston, etc.*, 515 U.S. 557, 569 (1995).

The Eleventh Circuit's most recent detailed treatment of the expressive conduct doctrine was in *Fort Lauderdale Food Not Bombs*. 901 F.3d at 1235. In that case, the court of appeals considered whether "outdoor food sharing was . . . expressive conduct protected by the First Amendment." *Id.* at 1238. The plaintiff, Fort Lauderdale Food Not Bombs ("FLFNB"), engaged in "peaceful political direct action" by "conduct[ing] weekly food sharing events at Stranahan Park . . . an undisputed public forum" which was "known in the community as a location where the homeless tend to congregate and, according to FLFNB, 'has traditionally been a battleground over the City's attempts to reduce the visibility of homelessness.'" *Id.* "FLFNB set[] up a table underneath a gazebo in the park, distribute[d] food, and its members (or, as the City describe[d] them, volunteers) [ate] together with all of the participants, many of whom are homeless individuals residing in the downtown Fort Lauderdale area." *Id.* "FLFNB's set-up include[d] a banner with the name 'Food Not Bombs' and the organization's logo—a fist holding a carrot—and individuals associated with the organization pass[ed] out literature during the event." *Id.*

"At these events, FLFNB distribute[d] vegetarian or vegan food, free of charge, to anyone who cho[se] to participate," not "as a charity, but rather to communicate its message":

> 'that [ ] society can end hunger and poverty if we redirect our collective resources from the military and war and that food is a human right, not a privilege, which society has a responsibility to provide for all.

*Id.* Thus, it contended, "[p]roviding food in a visible public space, and partaking in meals that are shared with others, is an act of political solidarity meant to convey the organization's message. *Id.*

In determining that FLFNB's activities were expressive conduct subject to the First Amendment's protections, the Eleventh Circuit considered five factors. First, "FLFNB sets up tables and banners (including one with its logo) and distributes literature at its events" which distinguishe[d] its sharing of food with the public from relatives or friends simply eating together in the park." *Id.* at 1242. Second, "the food sharing events [were] open to everyone, and the organization's members or volunteers invite[d] all who are present to participate and to share in their meal at the same time" which "has social implications." *Id.* Third, the events took place in a "a public park near city government buildings," which was "a traditional public forum." *Id.* Fourth, "the treatment of the City's homeless population [was] an issue of concern in the community." *Id.* Finally, the court explained that the "history of a particular symbol or type of conduct is instructive

in determining whether the reasonable observer may infer some message when viewing it" and determined that "the significance of sharing meals with others dates back millennia." *Id.* at 1243. On that record, the court found that FLFNB established an intent to express an idea and that a reasonable observer would interpret its food sharing activities as conveying a message. *Id.* (citing *Spence*, 418 U.S. at 411; *Holloman*, 370 F.3d at 1270).

Lastly, the Eleventh Circuit distinguished the Supreme Court's decision in *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47, 66 (2006), which held that the fact that "explanatory speech is necessary is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." The court explained that the language from *FAIR* "does not mean that conduct loses its expressive nature just because it is also accompanied by other speech" but that "[t]he critical question is whether the explanatory speech is necessary for the reasonable observer to perceive a message from the conduct." *Id.* at 1243–44 (citing *FAIR*, 547 U.S. at 66). The court explained:

> Explanatory speech is not necessary in this case. Although such speech cannot create expressive conduct, . . . context still matters. Here, the presence of banners, a table, and a gathering of people sharing food with all those present in a public park is sufficiently expressive. The reasonable observer at FLFNB's events would infer some sort of message, e.g., one of community and care for all citizens. Any "explanatory speech"—the text and logo contained on the banners—is not needed to convey that message. Whether those banners said "Food Not

Bombs" or "We Eat With the Homeless" adds nothing of legal significance to the First Amendment analysis. The words "Food Not Bombs" on those banners might be required for onlookers to infer FLFNB's specific message that public money should be spent on providing food for the poor rather than funding the military, but it is enough if the reasonable observer would interpret the food sharing events as conveying "some sort of message."

*Id.* at 1244 (citing *FAIR*, 547 U.S. at 66; *Holloman*, 370 F.3d at 1270).

### B.    History and Tradition of Charitable Bail Funds

As noted earlier, in *FLFNB* the Eleventh Circuit looked to the history of sharing food as a means of conveying message. In connection with this inquiry, Plaintiffs provided a declaration about the history and tradition of charitable bail funds referencing other sources. (Doc. 36-3). "[B]y the time of the United States's Founding, pretrial release on bail was a fundamental part of English constitutionalism, with procedural protections developed in Magna Carta, the Petition of Right, the Habeas Corpus Act, and the English Bill of Rights," eventually with a "prohibition on 'excessive bail' . . . incorporated into the Eighth Amendment to the U.S. Constitution." *Funk & Mayson, Bail at the Founding,* 137 Harvard Law Review 1816, 1828 (2024), available at SSRN: https://ssrn.com/abstract=4367646. From these beginnings, charitable bail work evolved alongside the prohibition on excessive bail as an additional check on prosecutorial overreach and a means of ensuring that the poor were not deprived of the presumption of innocence.

The Philadelphia Society for Alleviating the Miseries of Public Prisons, which was founded in 1787 by signer of the Declaration of Independence Dr. Benjamin Rush, among others, "operated essentially as a community bail fund" where "[p]risoners would send missives pleading their cases, Society officers would investigate, and in cases that the Society's Acting Committee deemed deserving, it would sponsor bail for the affected prisoner or provide other forms of aid." *Funk & Mayson*, *supra* at 1866.

Later, beginning in 1841, John Augustus, hailed by many as the father of probation, paid the bail of offenders and rehabilitated them prior to their sentencing, where they received a token sentence. *Panzarella, Theory and Practice of Probation on Bail in the Report of John Augustus*, 38 Fed. Probation (Dec. 2002 ed.), available at https://www.uscourts.gov/sites/default/files/66_3_6_0.pdf. And, as Plaintiffs recognize in their Complaint, in 1920, the American Civil Liberties Union created a bail fund to free individuals prosecuted under sedition laws. *Plans a Radical Bail Fund.: Civil Lborties [sic] Union Proposes to Raise $300,000*, N.Y. Times, Aug. 16, 1920, at 4, http://www.nytimes.com/1920/08/16/archives/plans-a-radical-bail-fund-civil-lborties-union-proposes-to-raise.html?searchResultPosition=1. Bail funds continued to be an important resource for protesters subjected to mass arrest throughout the civil rights era. Robin Steinberg, Lillian Kalish & Ezra Ritchin,

*Freedom Should Be Free: A Brief History of Bail Funds in the United States*, 2 UCLA
Crim. Just. L. Rev. 79, 86–89 (2018).

### C. Application to Plaintiffs' Conduct

Plaintiffs submitted evidence that they intended to convey a particularized
message: opposition to unnecessary, poverty-based detention. (Doc. 36-1 ¶ 3; Doc.
36-2 ¶ 7). And a reasonable observer would view their conduct as conveying some
message. In reaching this decision, the Court weighs the same factors the Eleventh
Circuit did in *FLFNB*.

First, Plaintiff Barred Business distinguishes its activities from the typical
bailing out of detainees by organizing members, volunteers, and family members,
to wait in the parking lot outside the detention centers, in full view of staff and
visitors, often streaming live on social media. (Doc. 36-1 ¶ 4). Barred Business
members and volunteers typically wear identifying shirts and hold signs and
posters or distribute flyers." (*Id.* ¶ 5). *Cf. FLFNB*, 901 F.3d at 1242 (citing *Hurley*,
515 U.S. at 570). Mr. Vodicka likewise makes clear to those involved in the criminal
justice system, including public defenders, judges, law enforcement, and jail staff
that he is affiliated with Oconee Street United Methodist Church and that his
charitable bail work is driven both by his faith and his opposition to poverty-based
detention. (Doc. 36-2 ¶ 7–9). This factor weighs strongly in favor of a finding of
expressive conduct, though perhaps slightly more for Plaintiff Barred Business.

Second, Plaintiffs' efforts are shared with the public. While it is not straightforward to analogize sharing food with the homeless and public alike with bailing out detainees, Plaintiffs encourage the public to join them in welcoming the former detainees to the community. (Doc. 36-1 ¶¶ 12, 15, 23; Doc. 36-2 ¶¶ 3, 5). *FLFNB*, 901 F.3d 1235, 1242 (11th Cir. 2018). The communal aspect of Plaintiffs' work weighs slightly in favor of a finding of expressive conduct.

Third, Plaintiffs' efforts take place at the jails where the detainees are held. Initially, this would seem to cut against Plaintiffs because jails are not considered public forums. *Adderley v. Fla.*, 385 U.S. 39, 47 (1966). However, Justice Brennan noted the limited reach of *Adderley* in a later dissent, writing that "though this Court held that the First Amendment did not protect a civil rights demonstration conducted on a jailhouse driveway, the Court was careful to observe that the 'particular jail entrance and driveway were not normally used by the public,' and that the jail custodian 'objected only to (the demonstrators') presence on that part of the jail grounds reserved for jail uses.'" *Greer v. Spock*, 424 U.S. 828, 861–62 (1976) (Brennan, J., dissenting) (citing *Adderley*, 385 U.S. at 45, 47). Justice Brennan's gloss on *Adderley* is important because there is no dispute that Plaintiffs' activities take place in areas open to the public (the parking lot and the bail clerk's office), and that their presence there is directly linked to their charitable bail activities. Because in some way there is no real option but to engage in their alleged expressive

conduct at the jails where the detainees are housed, this factor does not cut in either direction. *Cf. FLFNB*, 901 F.3d at 1242 ("Although the choice of location alone is not dispositive, it is nevertheless an important factor in the 'factual context and environment' that we must consider.").

Fourth, the debate over affordable cash bail is a matter of public concern. As the State's own Council on Criminal Justice Reform found in its 2018 Report, "[i]n recent years, a growing number of researchers, justice system stakeholders, and advocacy groups have highlighted troubling consequences of money-based bail and have recommended changes." Ga. Council on Crim. Justice Reform, *2018 Report* at 24, https://dcs.georgia.gov/document/publication/2017-2018-criminal-justice-reform-council-report/download; *see also id.* at 4 ("'We studied this important issue for a year, met with all the stakeholders, weighed the pros and cons, and delivered a product that passed with total support from both sides of the aisle. That's amazing, particularly on an issue that's so often at the center of partisan divides.' Governor Nathan Deal May 2, 2012"). This "background adds to the likelihood that the reasonable observer would understand that" Plaintiffs' organizing for charitable bail "sought to convey some message." *FLFNB*, 901 F.3d at 1243. This factor weighs strongly in favor of a finding of expressive conduct.

Fifth, as the Court explained in Section II.B. above, posting bail for others as an act of faith and an expression of the need for reform has an important history

in this country since its founding and "the history of a particular symbol or type of conduct is instructive." *FLFNB*, 901 F.3d at 1243. This factor weighs strongly in favor of a finding of expressive conduct.

Finally, the presence of explanatory speech does not negate the inherent expressiveness of Plaintiffs' conduct. As the Eleventh Circuit explained in *FLFNB*, "conduct [does not] lose[] its expressive nature just because it is also accompanied by other speech. 901 F.3d at 1243–44. Instead, "[t]he critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct." *Id.* at 1244 (emphasis added).

Particularly as to Plaintiff Barred Business, a reasonable observer seeing a group of people assembled outside of a jail, wearing matching graphic t-shirts, with or without signs, would naturally assume that some sort of message about incarceration was intended, even if he or she could not actually read the text on the shirts or signs. *Cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969) ("[T]he wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment."). So too for a person or persons who gather in prayer or identify themselves as affiliated with the same church.

On this point, the parties both cite to the Seventh Circuit's decision in *The Bail Project, Inc. v. Commissioner, Indiana Department of Insurance*, 76 F.4th 569 (7th

Cir. 2023). The Seventh Circuit held that The Bail Project's "act of paying cash bail does not inherently express any message," explaining that "without awareness of The Bail Project and its mission—presumably gleaned from the organization's website or other speech explaining its efforts—a reasonable person witnessing an employee from The Bail Project paying cash bail would not detect any message from the act itself." *Id.* at 577.

*The Bail Project* is distinguishable for several reasons. First, it is distinguishable factually, because in that case "[t]he only observers of The Bail Project's bail payments are the county clerk's office employees and by-standers who happen to be in the office," but here there is evidence that the general public and members of the criminal justice system observed Plaintiffs' conduct.

Second, the Seventh Circuit's rationale conflicts with the law of this circuit, because it considered "whether an observer would necessarily infer a specific message," rather than "some sort of message." *Compare FLFNB*, 901 F.3d at 1240–41 (citing *Holloman*, 370 F.3d at 1270) ("The district court concluded that 'outdoor food sharing does not convey [FLFNB's] particularized message unless it is combined with other speech, such as that involved in [FLFNB's] demonstrations.' . . . This focus on FLFNB's particularized message was mistaken."), *with The Bail Project*, 76 F.4th at 577 ("Without knowledge of The Bail Project's mission and repeat-player status, a reasonable observer would not understand its payment of

cash bail at the clerk's office as an expression of any message about the bail system. A person could be paying bail to secure a loved one's freedom pending trial, or they could be performing a purely charitable act to help an indigent defendant. But whatever their motivation for doing so, the point is that nothing about the act itself inherently expresses any view on the merits of the bail system.").

Third, *The Bail Project* is unpersuasive because it did not consider the "factual context and environment in which [the conduct] was undertaken." *FLFNB*, 901 F.3d at 1245; *see The Bail Project*, 76 F.4th at 581 (Jackson-Akiwumi, J., dissenting) ("In my view, the majority opinion does not properly consider context and audience when asking whether observers of The Bail Project's conduct understand—without the assistance of explanatory speech—that a message is being conveyed.").[7] The Seventh Circuit's distillation of the posting of bail to the moment that money is passed through a window is too narrow. 76 F.4th at 577. "Context separates the physical activity of walking from the expressive conduct associated with a picket line or a parade. . . . Context also differentiates the act of sitting down—ordinarily not expressive—from the sit-in by African Americans at a Louisiana library which was understood as a protest against segregation." *FLFNB*, 901 F.3d at 1241 (citing *United States v. Grace*, 461 U.S. 171, 176 (1983);

---

[7] The Seventh Circuit also did not grapple with the important historical context of charitable bail work, but it is possible that it was not presented with that information.

*Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966)). One might wonder if the majority in *The Bail Project* was faced with the facts of *FLFNB* whether it would look only to the moment a bite is taken from food to discern expressiveness.

The record shows that "[p]aying cash bail for a person is not a short process," (Doc. 36-2 ¶¶ 8–9), and all the circumstances surrounding the payment of bail, including waiting outside in the parking lot all hours of the day and night as well as in the jail's bail clerk's office provide important context to be considered in the analysis. In sum, the record shows that Plaintiffs' work paying cash bail is expressive conduct, and accordingly it receives First Amendment protection.

### D.   Application of Intermediate Scrutiny

Having found that Plaintiffs' expressive conduct is entitled to some First Amendment protection, it is important to note that the protection it receives is not absolute. Expressive conduct receives intermediate scrutiny, so long as "the governmental interest is unrelated to the suppression of free expression." *Texas v. Johnson* 491 U.S. 397, 407 (1989) ("Thus, although we have recognized that where 'speech and nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.") (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

The Court credits that the Government's proffered interest in ensuring that persons awaiting trial actually attend trial (discussed in more detail in the strict scrutiny context in Section III.C. below) is an "important or substantial governmental interest" and unrelated to the suppression of free expression. *O'Brien*, 391 U.S. at 377. The question then is whether the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. The Court finds that the Bail Limit fails under this standard.

As a backdrop to the analysis, the Court notes that before an individual is released on cash bail, a court has already determined that the person:

> (A) Poses no significant risk of fleeing from the jurisdiction of the court or failing to appear in court when required;
>
> (B) Poses no significant threat or danger to any person, to the community, or to any property in the community;
>
> (C) Poses no significant risk of committing any felony pending trial; and
>
> (D) Poses no significant risk of intimidating witnesses or otherwise obstructing the administration of justice.

O.C.G.A. § 17-6-1(e)(1).[8] Of course, the amount of bail is not irrelevant, and the state court will have made an initial assessment of the proper amount of bail based

---

[8] For misdemeanors, O.C.G.A. § 17-6-1(b)(1) provides:

on the individuals' circumstances.[9] But it bears stating that the persons being bailed out by Plaintiffs are not inherently flight risks or dangerous to the community. This context is important when considering the State's interest in enforcing the Bond Limit.

First, there appears to be a large subset of cases where the amount of bond set by a court is a token amount; sometimes $1 to $10. But even where a court has determined that a criminal defendant is such a low risk that a cash bond of $1 to

---

> Except as provided in subsection (g) of this Code section [dealing with family violence, aggravated misdemeanors, and DUI], at no time, either before a court of inquiry, when indicted or accused, after a motion for new trial is made, or while an appeal is pending, shall any person charged with a misdemeanor be refused bail. When determining bail for a person charged with a misdemeanor, courts shall not impose excessive bail and shall impose only the conditions reasonably necessary to ensure such person attends court appearances and to protect the safety of any person or the public given the circumstances of the alleged offense and the totality of circumstances.

[9] O.C.G.A. § 17-6-1(e)(2) provides that:

> When determining bail, as soon as possible, the court shall consider:
> (A) The accused's financial resources and other assets, including whether any such assets are jointly controlled;
> (B) The accused's earnings and other income;
> (C) The accused's financial obligations, including obligations to dependents;
> (D) The purpose of bail; and
> (E) Any other factor the court deems appropriate.

$10 is appropriate, the evidence in this case shows that this amount is still an obstacle to release. (Doc. 36-2 ¶ 14) ("[O]ne of these prisoners had been unable to post a $85 bond; another, $50. Nine could not post bonds in the amount of $10, and one needed $5 to gain release from jail. Five people had no one to post $1. All were charged with misdemeanor offenses. Collectively, these 17 women and men spent 274 days in the Clarke County jail before our bail fund set them free."). By not distinguishing based on the dollar amount of bond, the restriction on Plaintiffs' expressive conduct posed by the Bond Limit is greater than is essential to the furtherance of the State's interest.

Second, the Bond Limit, by treating all cash bonds the same, does not make any distinction based on the severity of the crime. Here, the Seventh Circuit's decision in *The Bail Project* is instructive, because the law it sustained is more narrowly tailored than the Act here: in Indiana, "charitable bail organizations are prohibited from paying bail for defendants who are either (1) charged with a crime of violence, or (2) charged with a felony and have a previous conviction for a crime of violence." 76 F.4th at 574. There is otherwise no limit on the number of times a charitable bail fund can post bond for an individual. By failing to distinguish based on the severity of the offense, the restriction on expressive conduct posed by the Bond Limit is greater than is essential to the furtherance of the State's interest.

Finally, the three-cash-bond-per-jurisdiction limit is essentially arbitrary. The State has not explained where the limit comes from or why it furthers its interest. There does not appear to have been any congressional findings or details about why an individual or entity posting four cash bonds rather than three suddenly undermines the State's interest in ensuring attendance of formerly detained individuals at trial.

For all of these reasons, the Court would sustain Plaintiffs' as-applied challenge to the Bail Limit in the event it had not already determined that it was facially unconstitutional.

## III. The Surety Requirement – Facial Content-Based Regulation Challenge

The Court next turns to the Surety Requirement, which the Plaintiffs challenge on First Amendment grounds.

### A. Background for Content- and Viewpoint-Based Restrictions on Speech

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., amend. 1). "Under that Clause, a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.* (quoting *Police Dept. of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). "Content-based laws—those that target speech based on its

communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citations omitted).

"Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* at 168–69 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). But "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169 (citing *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)). Moreover, "[i]t is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

As the Supreme Court has recently reiterated, in a typical constitutional challenge, "a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, ---U.S. ----, 2024 WL 3237685, at *8 (July 1, 2024) (quoting *United States v. Salerno*, 481

U.S. 739, 745 (1987); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)). However, in a First Amendment case, "[t]he question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

## B.     Text of the Surety Requirement and Related Statutes

The Surety Requirement in general treats charitable bail funds as if they were private surety companies by providing that:

> Every individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons shall be required to submit to the same requirements as any professional surety company, including, without limitation, the requirements set forth in paragraph (1) of this subsection and Code Sections 17-6-50, 17-6-50.1, and 17-6-51.

O.C.G.A. § 17-6-15(b)(4) (2024). The incorporated requirements in paragraph (1) are:

> (1)  . . . . If the sheriff determines that a professional bonding company is an acceptable surety, the rules and regulations shall require, but shall not be limited to, the following:
>
> (A) Complete documentation showing the composition of the company to be an individual, a trust, or a group of individuals, whether or not formed as a partnership or other legal entity, or a corporation or a combination of individuals, trusts, and corporations;

(B) Complete documentation for all employees, agents, or individuals authorized to sign or act on behalf of the bonding company;

(C) Complete documentation showing that the company holds a valid business license in the jurisdiction where bonds will be written;

(D) Fingerprints and background checks of every individual who acts as a professional bondsperson as defined in Code Section 17-6-50 for the professional bonding company seeking approval;

(E) Establishment of a cash escrow account or other form of collateral as follows:

> (i) For any professional bonding company that is new to the county or that has operated continuously in the county for less than 18 months, in an amount and upon terms and conditions as determined and approved by the sheriff;

> (ii) Once a professional bonding company has operated continuously for 18 months or longer in the county, then any such cash escrow account or other form of collateral shall not exceed 5 percent of the current outstanding bail bond liability of the professional bonding company and such cash escrow account shall not be required to have on deposit an amount in excess of $1,000,000.00; and

> (iii) No professional bonding company shall purchase an insurance policy in lieu of establishing a cash escrow account or posting other collateral; provided, however, that any professional bonding company which was using an insurance policy as collateral as of December 31, 2013, may continue to do so at the discretion of the sheriff.

(F) Establishment of application, approval, and reporting procedures for the professional bonding company deemed appropriate by the sheriff which satisfy all rules and regulations required by the laws of this state and the rules and regulations established by the sheriff;

(G) Applicable fees to be paid by the applicant to cover the cost of copying the rules and regulations and processing and investigating all applications and all other costs relating thereto; or

(H) Additional criteria and requirements for approving and regulating bonding companies to be determined at the discretion of the sheriff.

O.C.G.A. § 17-6-15(b)(1). Section 17-6-50 governs professional bondsmen and provides that they must meet the following qualifications:

(1) Is 18 years of age or over;

(2) Is a resident of the State of Georgia for at least one year before making application to write bonds;

(3) Is a person of good moral character and has not been convicted of a felony or any crime involving moral turpitude; and

(4) Is approved by the sheriff and remains in good standing with respect to all applicable federal, state, and local laws and all rules and regulations established by the sheriff in the county where the bonding business is conducted.

O.C.G.A. § 17-6-50. Section 17-6-50.1 requires eight hours of continuing education for professional bondsmen. O.C.G.A. § 17-6-50.1. Lastly, § 17-6-51 prohibits professional bondsmen from "suggest[ing] or advis[ing] the employment of or

name for employment any attorney or attorneys to represent a defendant."
O.C.G.A. § 17-6-51.

Even if a charitable bail funds meets all of these requirements, "the sheriff
has discretion to decide whether a candidate is acceptable, and the statute 'shall
not' require a sheriff to accept any specific applicant." *A.A.A. Always Open Bail
Bonds, Inc. v. DeKalb Cnty.*, 129 F. App'x 522, 524 (11th Cir. 2005).

> Therefore, even if an applicant met the minimum
> requirements for a certificate of authority prescribed by
> statute, it cannot claim any entitlement to that certificate
> because the statute expressly provides for the sheriff to
> exercise discretion to decide, generally, how many, and
> specifically, to which, applicants the sheriff will issue
> certificates.

*Id.*

### C.   Application to Surety Requirement

Plaintiffs argue that the Surety Requirement "restricts content-based speech
by singling out entities that 'purport[] to be a charitable bail fund with the purpose
of soliciting donations to use for securing the release of accused persons' and
mandating that they meet the strict regulatory requirements that apply to for-
profit surety companies." The Court agrees.

First, the Surety Requirement is a content-based burden on speech because
it only applies to entities that "purport[] to be a charitable bail fund with the
purpose of soliciting donations to use for securing the release of accused persons."

The plain language meaning of "purport" is "to convey, imply, or profess outwardly (as meaning, intention, or true character) . . . ." "Purport." *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/purport (last accessed July 2, 2024). Imagine if Church A and Church B both use funds to bail out members of the community, but only Church A posts a public appeal to congregants to raise money for the purpose. Under the Act, only Church A would be required to comply with the Surety Requirement. The only difference between the two churches is that Church A engaged in speech.[10] The State essentially conceded as much at the TRO Hearing. (*See* Tr. 20:1–5) ("MS. CROWDER: . . . The second question that you were asking about with the term 'purports,' I believe the answer to the question is that the term 'purports' suggests that the person has stated that that is what they intend to do.").

In the commercial context, regulating how an entity purports itself to the public would not be unusual. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 251 (2010); *Fla. Bar v. Went For It*, Inc., 515 U.S. 618, 621 (1995). Indeed, Georgia's law defines a professional bondsperson as "one who holds himself or herself out as a signer or surety of bonds for compensation." O.C.G.A. § 17-6-50. But the Supreme Court has been clear that a central justification of regulating

---

[10] The restriction is arguably viewpoint-based, because it only applies to speech in favor of securing the release of accused persons. But the Court need not reach this issue.

commercial speech is "profit motive" which "likely diminishes the chilling effect that may attend its regulation." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996). The Surety Requirement, by targeting charitable speech, lacks this justification.

Because the Surety Requirement is content-based, "[it] can stand only if [it] survive[s] strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed*, 576 U.S. at 171 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). The State's advanced interest is "ensuring that individuals and organizations who opt to engage in the business of bailing out criminal defendants do so in a manner that comports with and does not undermine the State's interest in ensuring that pretrial detainees appear for trial." (Doc. 26 at 2). Again, Plaintiffs' work is not profit motivated and the State's justification is misplaced to the extent it contends that charitable bail funds are "engag[ing] in the business of bailing out criminal defendants." But the Court does credit the State's interest in ensuring that pretrial detainees appear for trial.

However, the Court finds that the Surety Requirement is not narrowly tailored to achieve that interest. First, as the Plaintiffs point out, several of the Surety Requirements, such as the requirement to maintain a cash escrow, the requirement of good moral character and no felony convictions, and the unlimited

discretion of sheriffs to deny applicants who meet the requirements are creditworthiness factors that only make sense when considering that surety bond companies only offer a promise to pay if the bond is forfeited, whereas with cash bonds the face amount is paid in full up front. (Doc. 2-1 at 2).

Second, the State argues that bail bonds do not serve the purpose of ensuring appearance at trial when paid by charitable bail funds. *The Bail Project, Inc. v. Comm'r, Ind. v Dep't of Ins.*, 76 F.4th 569, 578 (7th Cir. 2023) ("The legislature could have determined that charitable bail organizations have different incentives, resources, and ties to the community than other bail payors, and therefore, that it was appropriate to treat them differently than bail payors who risk their own money and weigh their own safety to bail out a defendants."). But it is not clear how requiring charitable bail funds to comply with surety bond company regulations is narrowly tailored to address this concern. "While a bond is usually required to insure the defendant's appearance, 'There may be other deterrents to jumping bail: long residence in a locality, the ties of friends and family, the efficiency of the modern police. All these in a given case may offer a deterrent at least equal to that of the threat of forfeiture.'" *Carbo v. United States*, 82 S. Ct. 662, 665 (1962) (quoting *Bandy v. United States*, 81 S. Ct. 197, 198 (1960)). If the State is concerned about the risk of bail jumping or other pretrial misconduct by a particular class of detainees whose bail is paid by charitable bail funds, there are

more straightforward ways to deter that conduct. *Cf. The Bail Project*, 76 F.4th 569, 574 (7th Cir. 2023) (upholding law prohibiting charitable bail funds "from paying bail for defendants who are either (1) charged with a crime of violence, or (2) charged with a felony and have a previous conviction for a crime of violence.").

Finally, the Court finds that "a substantial number of [the Surety Requirement's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 594 U.S. at 615. The Parties did not squarely address this, but the Court finds that while the Surety Requirement that professional bondspersons be 18 years of age or over, reside in the State of Georgia for one year, and engage in continuing education are not in and of themselves illegitimate, they are plainly outweighed by the Act's burdensome requirements of a cash reserve, background checks, and sheriff approval. Accordingly, the Court finds that the Surety Requirement fails strict scrutiny facially.[11]

## IV.    Remaining Injunctive Relief Factors

Finally, the Court finds that the remaining injunctive relief factors are met. "[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (quoting

---

[11] For the same reasons the Court gave in Section II above, the Court would also sustain an as-applied challenge to the Surety Requirement based on its burden on Plaintiffs' expressive conduct.

*Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Moreover, the Court finds that the approximately two-month period between the passage of the Act and the Plaintiffs' filing of the Motion does not weigh against a finding of irreparable injury, because it is unreasonable to expect that Plaintiffs would be able to make an informed decision about securing counsel in a shorter period of time than that. *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1285 (N.D. Fla. 2021) (granting injunction where "[r]oughly three months passed from the day Governor DeSantis signed HB1 to the day Plaintiffs filed their motion for preliminary injunction.").

While an injunction would prevent the State from enforcing the Bond Limit and Surety Requirement, the Act's myriad other bail reforms continue in effect, and judges retain the discretion to deny cash bail in proper cases. Therefore, any harm to the State in restraining Section 4 is speculative. Moreover, "the public has no interest in the enforcement of what is very likely an unconstitutional statute." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).[12]

---

[12] The Federal Rules of Civil Procedure instructs courts to only issue preliminary injunctions "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65. "[B]ut it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (citations and quotations omitted). The Court finds that no security is

**Conclusion**

The Court finds that the Bond Limit in Section 4 is unconstitutionally vague in all its applications and sustains Plaintiffs' facial challenge under the Fourteenth Amendment's Due Process Clause. The Court also sustains Plaintiffs' First Amendment challenges to the Bond Limit and the Surety Requirement because both provisions are not sufficiently tailored to address the States's legitimate interest in ensuring that people attend trial. Plaintiffs have shown a likelihood of success on the merits and satisfied the remaining preliminary injunctive relief factors.

For the reasons given above, the Court **GRANTS** Plaintiffs' request for a preliminary injunction. It is therefore

**ORDERED** that Defendants are **ENJOINED** from enforcing Section 4 of Georgia Senate Bill 63 (2024 Georgia Laws Act 507) during the pendency of this litigation.

**SO ORDERED** this 12th day of July, 2024.

Victoria Marie Calvert
United States District Judge

---

necessary in this case for the same reasons it found that the balance of hardship favors Plaintiffs, and because of the public interest nature of Plaintiffs' suit.